**Paul WEYRICH, Appellant,**

v.

**THE NEW REPUBLIC, INC.,
et al., Appellees.**

No. 99–7221.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 11, 2000.
Decided Jan. 5, 2001.

---

Larry Klayman argued the cause and filed the briefs for appellant.

Andrew H. Marks argued the cause for appellees. With him on the brief were Clifton S. Elgarten and Stuart H. Newberger.

Before: EDWARDS, Chief Judge, ROGERS, Circuit Judge, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Appellant Paul Weyrich appeals from an order of the District Court dismissing his suit for defamation, false light invasion of privacy, and civil conspiracy to defame. Weyrich's complaint asserts that he was defamed by an article, "Robespierre of the Right—What I Ate at the Revolution," authored by David Grann and published by *The New Republic* on October 27, 1997. The article is flowered with anecdotes that reveal Weyrich to be both emotionally volatile and short-tempered, and it depicts him as both a zealoted political extremist and an easily-enraged tyrant of the first order.

Weyrich complains that the article oversteps the bounds of protected political commentary by attributing to him, as its central theme, the diagnosable mental condition of paranoia. He further contends that, in presenting its overall picture of mental instability, the piece relies on false and misleading anecdotes, as well as two defamatory caricatures. The District Court disagreed and granted appellees' motion to dismiss Weyrich's complaint in its entirety prior to discovery.

We reject Weyrich's claim that the article attributes to him a diagnosable mental illness. "Paranoia" is used in the article as a popular, not clinical, term, to embellish the author's view of Weyrich's political zealotry and intemperate nature. The author's musings on these scores are protected political commentary, for, in context, it is clear that his comments are meant only to deride Weyrich's political foibles and, relatedly, to attack what the author sees as the inability of the conservative movement "to accept the compromising nature of power." In short, these comments cannot reasonably be understood as verifiably false, and, therefore potentially actionable, assertions of mental derangement.

There are other segments of the article, however, that may extend beyond protected commentary. Accepting the facts as alleged in the complaint, as we must, it appears that some of the anecdotes reported in the article are reasonably capable of defamatory meaning and arguably place Weyrich in a false light that would be highly offensive to a reasonable person. Thus, because we find that some of the article's contested statements are both verifiable and reasonably capable of defamatory meaning, at least a portion of the complaint is sufficient to survive a Rule 12(b)(6) motion to dismiss. We are therefore constrained to reverse and remand the case for further proceedings.

## I. Background

### A. The Article

The cover of the October 27, 1997 issue of *The New Republic* carries a caricatured and smiling Paul Weyrich leaning against a guillotine, arms crossed and wearing the square-buckled shoes of a puritan. The disembodied heads of conservative politicians—Newt Gingrich, Fred Thompson,

and others—litter the ground, each donning wide-eyed looks of consternation and disbelief. Just left of the scene, the cover reads "Robespierre of the Right—Paul Weyrich and the Conservative Quest for Purity." Between the covers of the cited issue of the magazine is the disputed article that is the subject of this law suit. *See* David Grann, *Robespierre of the Right— What I Ate at the Revolution,* THE NEW REPUBLIC, OCT. 27 1997, at 20 (hereinafter *"Article"*). The five-page article purports to offer a brief story of appellant's life as a leading member of the conservative movement over the past 30 years. The article poses Weyrich as a symbol of the movement. And the author postulates that, because of its uncompromising character, the movement has torn apart and destabilized a Republican party it helped to create.

At the outset of the article, Grann offers a justification for the piece: "If Weyrich were the only conservative purging Republicans, he would be no more than an interesting character—a minor, albeit compelling, player in the history of the conservative movement. Yet, he has become, in many respects, a case study of the conservative mind." *Article,* at 20. Grann then dedicates the first part of the article to appellant's role in the rise of populist conservatives to national prominence in the 1970s. The article catalogs Weyrich's various leadership roles in the ideological movement: from founding the Conservative Lunch Club of Capitol Hill, to launching the Heritage Foundation, to establishing the Free Congress Foundation, appellant helped grow the movement at every stage—even coining the term "moral majority."

The article's description of appellant takes a decided turn, however, when the story moves to the period beginning with the inauguration of Ronald Reagan: "By 1981, while his friends were still basking in their newfound power, Weyrich began to experience sudden *bouts of pessimism and paranoia*—early symptoms of the nervous breakdown that afflicts conservatives today." *Article,* at 22 (emphasis added). Thereafter, the remainder of the article reveals appellant to be an uncompromising, vengeful, and often tyrannical "symbol" of the conservative movement. He engineers the downfall of John Tower. *Id.* He accuses Senator Orrin Hatch of having "psychological problems." *Id.* at 19. He distances himself from Newt Gingrich, who, he says, "does not have *any* immutable principles that he would die for," and Trent Lott, who he describes as "the greatest disappointment of my life." *Id.* at 24 (emphasis in original).

The article relays the following notable episode:

By the 1988 presidential campaign, Weyrich was even more disillusioned. When the Bush camp refused to meet with a group of Afghani resistance fighters, Weyrich conspired to hide them in an adjoining room when Dan Quayle turned up for a luncheon hosted by the Free Congress Foundation; the plan was to spring them on the unsuspecting Quayle. But at the last minute, Bill Pascoe, Bush's liaison to the Beltway conservatives, leaked the plot, and Weyrich snapped. "Suddenly there was a volcano of screaming," recalls one lobbyist in the room. "Weyrich was calling Bill a traitor. He was spitting and frothing at the mouth. We were ready to get him a room right next to Hinckley." When the yelling stopped, Weyrich dispatched a letter to Pascoe's fiancée, questioning Pascoe's loyalty and implying that he was unfit for marriage.

*Id.* at 22. On the page opposite this vignette, there appears a second caricature, this time depicting appellant in a tie and suspenders, feeding on a skewer of charred bodies. Its portrayal of appellant echoes Grann's comparison of appellant to conservatives generally: "Since taking power in 1994, conservatives have gorged even by their standards. They have savaged Dole, ravaged Gingrich, plumped up and then devoured Lott. They have shut

622

down the government they spent decades trying to fill. They have, in short, acted as nutty as Weyrich." *Id.* at 22. The piece calls this tendency "Weyrichism," referring to "the kind of rhetoric that brands one's own people apostates when they make some of the compromises that power inevitably demands." *Id.*

Grann then details appellant's latest project, a conservative cable channel known as National Empowerment Television ("NET"): "Launched in 1993 with a budget of roughly $10 million, it was supposed to be Weyrich's masterwork: the first ideologically driven public affairs network in America, a kind of third-wave *Pravda*." *Id.* at 23. The article describes the network as a 24–hour vehicle, both on and off screen, for Weyrich's conservatism. Not only did he host many of the shows, he "even imposed ideological litmus tests on stagehands and secretaries. The result, staffers say, was sound technicians who could spout the pro-life line but not plug in the microphone." *Id.* Grann notes that "[o]ne reporter says he was nearly fired for getting a response from the Clinton administration about a scandal; he recalls how, when a guest blurted out on air that he was gay, Weyrich became apoplectic. 'Why should I be ashamed?' Weyrich says. 'I want people on a mission.'" According to the article, appellant eventually transformed the station into a self-contained fiefdom:

> More and more isolated, Weyrich now surrounds himself with a coterie of sycophants who, aides say, have little understanding of television and who patrol the corridors maintaining ideological discipline. His inner circle consists mainly of family members who receive handsome salaries for their services: one son is in charge of coalition luncheons; another produces "Morning View" on NET; his daughter is vice president for development.
>
> Weyrich also increasingly relies on Bill Lind, a kind of minister of culture who hosts "Next Revolution" each week,

always wearing what appears to be the same black turtleneck. Lind's own Manichaean ideology has only encouraged Weyrich.

*Id.* at 24.

"As they had back home in Wisconsin," the article reports, "people in Washington soon crossed to the other side of the street when they saw Weyrich coming. Gingrich, who had anchored two shows, declined to sign another contract. Lott revoked the special Senate parking privileges Weyrich had gotten after a car accident. GOP Senator John McCain of Arizona refused even to talk to him. 'We know,' says Senator Orrin Hatch, 'who has the psychological problems.'" *Id.* By 1996, the network had run into financial trouble. Too much conservative competition on the national networks and mainstream cable channels meant that Weyrich needed to "shout louder just to be heard. On one recent evening, when Republican Congressman Joe Barton left an NET broadcast early in order to cast a vote, Weyrich lost it. He blastfaxed his remarks to the media under the headline: 'Congressman walks out on NET live interview.' 'You wonder why they break their word on these big things,' he fumed. 'They can't even keep their word on little things.'" *Id.*

The article closes with Grann interviewing appellant at the Monocle, a famed insider Washington restaurant, "where JFK sent a limo from the White House to pick up his favorite sandwich." *Id.* Grann notices that appellant appears uncomfortable with his surroundings, that "[h]e seems conscious of being mistaken for the people around him.... When [Grann] ask[s] him what to order, he says he doesn't eat here enough to know. Yet, judging by the staff's reaction to him, he seems to be a regular—a fact the manager later confirms." *Id.* Asked whether he had not become "a kind of K Street Robespierre— a man who once devoted his life to building a movement and who now profits by de-

stroying it," appellant offers Grann a "glimpse [of] his famous temper":

> "I defy anybody to tell me any privilege that I have as a result of what I'm doing," Weyrich says, turning red. "I just think that is a bogus charge." Though he makes at least $280,000 a year for all his operations, and was driven to the restaurant in a chauffeured sedan, [Grann doesn't] say anything. "If the good Lord wants me to do something else then I'll be gone tomorrow," he continues, his voice rising. "Every year I have been in this city, I find it more sinful. And I have prayed many times for the opportunity to do something else. And so far the answer keeps coming back: 'Keep doing what you're doing.'"

*Id.*

## B. The Present Action

Less than one year after the disputed publication, appellant filed suit against appellees *The New Republic*, Grann, and others in Florida state court for defamation, civil conspiracy to defame, and false light invasion of privacy. *See* Complaint, *Weyrich v. The New Republic, Inc.*, No. 098–7628 (Fla. Cir. Ct. Sept. 22, 1998) (hereinafter "Complaint"), *reprinted in* Joint Appendix ("J.A.") at 5. Appellees removed the case on diversity grounds to the United States District Court for the Middle District of Florida, which then transferred it to the District Court for the District of Columbia. The District Court dismissed the complaint on August 13, 1999 in response to appellees' Rule 12(b)(6) motion. The instant appeal followed.

The complaint alleges that the article "contains false, misleading, disparaging and defamatory statements about Mr. Weyrich that wrongfully portray him as mentally unsound and paranoid. Persons who read this Article understood it to have such meaning." Complaint ¶ 12. As examples, it cites both the above-quoted reference to "bouts of pessimism and paranoia," and a pair of sentences from the first page of the piece: "The habits of suspicion, pessimism, and antagonism run too deep. And nowhere do they run deeper than in Paul Weyrich." *Id.* ¶ 13 (quoting *Article*, at 20, but failing to finish the quoted sentence: "—a man trying his hardest to destroy the very Republican establishment he spent his life building"). In addition to these direct "attributions" of paranoia, the complaint identifies a number of the article's anecdotal vignettes, including most of the above-quoted passages, which "further wrongfully depict Mr. Weyrich as mentally unsound and paranoid ... [and] that wrongfully portray Mr. Weyrich as isolated, tyrannical and violent." *Id.* ¶¶ 14–15. Finally, it alleges that the two caricatures contribute to the article's portrait of appellant as "mentally unsound and paranoid." *Id.* ¶¶ 16–17.

## II. Analysis

We review the District Court's grant of appellees' Rule 12(b)(6) motion to dismiss *de novo*. *Taylor v. FDIC*, 132 F.3d 753, 761 (D.C.Cir.1997). "Dismissal under Rule 12(b)(6) is proper when, taking the material allegations of the complaint as admitted, *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), and construing them in plaintiff['s] favor, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the court finds that the plaintiff[ ] ha[s] failed to allege all the material elements of [his] cause of action." *Id.* In undertaking this review, we must assume, as the complaint alleges, the falsity of any express or implied factual statements made in the article. *See* Complaint ¶¶ 12–17, 28, 32. We must also assume that such statements were made by appellees with knowledge of their falsity or reckless disregard for their truth. *See id.* ¶¶ 29, 33. We must then decide whether the disputed article (1) contains express or implied verifiably false statements of fact, which (2) are reasonably capable of defamatory meaning or otherwise place appellant in an offensive false light. *See Moldea v. New York*

*Times Co.,* 15 F.3d 1137, 1142–43 (D.C.Cir. 1994) (hereinafter *"Moldea I"), rev'd in part on reh'g,* 22 F.3d 310 (D.C.Cir.1994) (hereinafter *"Moldea II"); see also Guilford Transp. Ind., Inc. v. Wilner,* 760 A.2d 580, 597 (D.C.2000).

### A. Verifiable Statements under *Milkovich, Moldea I,* and *Moldea II*

■ For a statement to be actionable under the First Amendment, it must at a minimum express or imply a verifiably false fact about appellant. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Moldea II,* 22 F.3d at 313 ("[S]tatements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false."). However, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695 (relying on *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)). Thus, the First Amendment provides protection for "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695 (quoting *Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)). In deciding whether a reasonable factfinder could conclude that a statement expressed or implied a verifiably false fact about appellant, the court must consider the statement in context. *Moldea II,* 22 F.3d at 313–15. "This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695 (quoting *Hustler Magazine,* 485 U.S. at 53–55, 108 S.Ct. 876). Verifiability is therefore a critical threshold question at the Rule 12(b)(6) stage.

■ With these principles in mind, we reject appellant's claim that, by stating that he "began to suffer bouts of pessimism and paranoia" following the 1981 election, the article actually attributes to appellant a "debilitating psychological condition." Appellant's Br. at 15. The article's single reference to "paranoia" is certainly pejorative, but the author deploys it in its popular, not clinical, sense to describe and criticize what he sees as "early symptoms of the nervous breakdown that afflicts conservatives today." *Article,* at 22. Appellees rightly point out that the definitive, clinical term "paranoia" has taken on a less-than-definitive popular meaning, as have "crazy" and "nutty."

Appellant argues that the present case is indistinguishable from *Goldwater v. Ginzburg,* 414 F.2d 324 (2d Cir.1969), in which the Second Circuit upheld a defamation judgment against media defendants for reporting that Senator Barry Goldwater had a paranoiac personality. There, two authors penned a psychobiography of the Senator for *Fact Magazine,* asserting that he, in fact, suffered from clinically diagnosable paranoia. In so doing, they relied on a single-question survey of thousands of psychiatrists, whom they asked whether the Senator was "psychologically fit to serve as President of the United States" after informing each that the Senator had already suffered from two nervous breakdowns (which was not true). *Id.* at 329–30. They presented their findings as a psychological profile of the Senator, detailing various instances of his political and personal conduct as predictable manifestations of an underlying psychological illness. In short, the article purported to be a well-researched psychiatric diagnosis—which it was not.

The holding in *Goldwater* is both unremarkable and inapposite. The defendants in that case had published a fraudulent diagnosis, which was itself verifiable. Here, references to "bouts of pessimism and paranoia," "habits of suspicion, pessimism, and antagonism," and the fact that other conservatives have acted "as nutty as Weyrich," cannot be so understood.

Certainly, looking at these statements in isolation, a reasonable reader *might* interpret them to attribute a diagnosable and debilitating mental affliction to appellant. "Bouts of ... paranoia" *might* suggest appellant actually suffered repeated delusional or psychotic episodes, as appellant's brief suggests. But, the First Amendment demands that we place these references in their proper context. *Moldea II*, 22 F.3d at 314 (reversing in part *Moldea I* on rehearing, because *"Moldea I* erred in assuming that *Milkovich* abandoned the principle of looking to the context in which speech appears").

The present case fits comfortably within the well-guarded *Bresler–Letter Carriers* line of decisions, the vitality of which the Supreme Court recently reaffirmed in *Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695. In *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), the Court extended First Amendment protection to a newspaper's assertion that a real estate developer had "blackmailed" the city. The Court noted that the statements would have been actionable if the paper actually had accused Bresler of committing the crime of blackmail. However, context revealed that the newspaper had used the term only to describe Bresler's hard-nosed negotiating tactics. *Id.* at 13, 90 S.Ct. 1537. Similarly, in *National Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), the Court held that a union could not be sued for its use of the term "scab," defined in part as a "traitor," though actual accusations of treason would be actionable. *Id.* at 283–84, 94 S.Ct. 2770.

As used in the present case, the term "paranoia" animates the author's critique of what he sees as appellant's (and other conservatives') unwavering and, ultimately, self-defeating political dogmatism. The difficulty in the present case, if there is one, stems from the author's decision to interweave examples of appellant's political extremism with examples of his behavioral extremism. In one episode, the article reports appellant as having "snapped" and "frothed at the mouth," erupting in anger so irrationally that onlookers were "ready to get him a room right next to Hinckley." *Article*, at 22. In another, he becomes "apoplectic" after a guest admits his homosexuality on the air. *Id.* at 23. Former colleagues no longer speak to him; Orrin Hatch has implied that he has "psychological problems." *Id.* at 24. Appellant has withdrawn, "[m]ore and more isolated," surrounding himself with "a coterie of sycophants," including Bill Lind, whose "Manichaean ideology has only encouraged [appellant]." *Id.* Appellant argues that these episodes and anecdotes provide as much context for the phrase "bouts of ... paranoia" as does the general political commentary, and a reasonable reader might therefore regard the article as actually asserting that appellant suffers from, or has been diagnosed with, a psychological ailment.

Admittedly, the article paints an unflattering picture of appellant. Indeed, it uses examples of his "famous temper" to shade the line between political extremism and personal extremism, suggesting that the alleged irrationality of the conservative right runs deeper than mere ideology. But the article's suggestion that appellant's behavior exhibited "paranoia" is rhetorical sophistry, not a verifiably false attribution *in fact* of a "debilitating mental condition" as was the case in *Goldwater*. Never does the article claim to make a psychological pronouncement, nor would a reasonable reader understand it to do so. *The New Republic* is itself well-known to be a magazine of political commentary, a self-described "Weekly Journal of Opinion." Presented in such a loose manner, in such a well-understood context, the article's reference to "bouts of ... paranoia" is neither verifiable nor does it imply specific defamatory facts about appellant. Likewise, the caricatures, though biting, are not actionable. *See Hustler Magazine*, 485 U.S. at 53–54, 108 S.Ct. 876 (extolling

the value of political cartoons to a free society).

■ These findings do not end our analysis, however. The fact that the use of the term "paranoia" constitutes protected, unverifiable comment in the present case does not insulate the otherwise verifiable anecdotes reported by the author in support of his assertions that Weyrich is "nutty" and notable for his "famous temper." In other words, an article's political "context" does not indiscriminately immunize every statement contained therein.

The complaint asserts that appellees have published a number of false anecdotes, suggesting to the average reader that appellant is not only a political reactionary, but emotionally volatile, perhaps even mentally unsound, and otherwise unfit for his profession. For example, the article includes some historical vignettes which, alone and in concert, offer the reader a glimpse of appellant's "famous temper." *Article*, at 24. Unlike the two caricatures, nothing in the common parlance of political criticism would alert a reasonable reader that the article's anecdotes about Weyrich are other than verifiable facts. Indeed, in a number of instances, the author utilizes quotations, some purportedly from appellant, to further reinforce the impression that the stories are in fact true. *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 519–20, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) ("The orthodox use of a quotation is the quintessential 'direct account of events that speak for themselves.' ") (quoting *Time, Inc. v. Pape,* 401 U.S. 279, 285, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971)). The anecdotes are not offered as forms of parody, *see Hustler Magazine,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (offering examples of protected parody); they are presented as the truth about Weyrich. And in most instances, the offending anecdotes are verifiable.

■ The line separating a fabricated narrative and hyperbolic description of an actual event is sometimes fuzzy. The

First Amendment protects a reporter's "rational interpretation" of events or factual statements when relying on ambiguous sources. *Masson,* 501 U.S. at 519, 111 S.Ct. 2419. If it turns out that the facts underlying the offending anecdotes are true, and appellant takes issue instead with the article's description and rhetorical juxtaposition of events, appellant's claim must fail. Rational interpretation passes over into verifiably false reporting of the described events only when the author has, through description and reporting, *materially altered* the underlying facts. *Id.* at 516, 111 S.Ct. 2419. These issues are not before us on this appeal, however. Rather, as noted above, our inquiries on this appeal are limited to whether the disputed article (1) contains express or implied verifiably false statements of fact, which (2) are reasonably capable of defamatory meaning or otherwise place appellant in an offensive false light. We conclude here that the reported anecdotes survive the verifiability screen. We turn now to consider whether the cited anecdotes are reasonably capable of defamatory meaning.

**B. Reasonably Capable of Defamatory Meaning**

■ Because this is a diversity action, we must first decide the proper law of defamation and false light invasion of privacy to apply. This court looks to the choice of law rules prevailing in the District of Columbia, *see Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), which employs the governmental interest analysis test of the *Restatement Second of Conflict of Laws, Vaughan v. Nationwide Mut. Ins. Co.,* 702 A.2d 198, 200 (D.C. 1997). Applying it to defamation actions, "[t]he weight of authority considers that the law to be applied is ... [that of] the place where the plaintiff suffered injury by reason of his loss of reputation." *Dowd v. Calabrese,* 589 F.Supp. 1206, 1210 (D.D.C. 1984) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 150 cmt. e (1971)). Given the nature of appellant's livelihood,

given that appellant worked in Washington, D.C. at the time the article was published, and given that both parties rely on District of Columbia law, we apply the District's common law of defamation and false light invasion of privacy in assessing the claims before us.

 A statement is actionable in defamation under District of Columbia law if it is both false and defamatory. *Moldea I*, 15 F.3d at 1142. As noted above, because this is an appeal from a grant of a Rule 12(b)(6) motion, we must assume the falsity of any verifiable statement. A statement is defamatory "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293–94 (D.C.Cir.1988) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 988 (D.C.1984)). An "allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Best*, 484 A.2d at 989. Whether a statement is capable of defamatory meaning is a question of law, but "[i]t is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C.Cir. 1990) (quoting *Levy v. American Mut. Ins. Co.*, 196 A.2d 475, 476 (D.C.1964)).

 Although we do not here dissect each verifiable statement to provide an exhaustive list for the District Court, potential candidates include the author's observation that appellant, in response to Bill Pascoe's perceived betrayal, "snapped," erupted in a "volcano of screaming," "froth[ed] at the mouth," and "dispatched a letter to Pascoe's fiancée, questioning Pascoe's loyalty and implying that he was unfit for marriage." *Article*, at 22. If indeed the story is fabricated, we cannot say that it is not reasonably capable of any defamatory meaning—it arguably makes appellant appear highly volatile, irrational, unsound and otherwise "odious, infamous, or ridiculous."

 Not all of the verifiably false anecdotes relied upon by appellant are reasonably capable of defamatory meaning. For example, at the hearing on the motion to dismiss in the District Court, counsel for appellant protested vigorously that the author had defamed appellant by falsely asserting that Newt Gingrich had refused to sign another NET anchor contract, that Trent Lott had revoked appellant's capitol parking privileges, and that John McCain will not talk with him. Transcript of Hearing, at 8–9 (Aug. 13, 1999), *reprinted in* J.A. at 33. We agree with the District Court that, even if false, these facially innocuous statements are not themselves defamatory and, as such, should have no bearing on the resolution of appellant's claims on remand. They certainly do not, on their face, suggest anything untoward about appellant. On remand, the District Court must decide which of the verifiably false statements cited by appellant are reasonably capable of defamatory meaning. We emphasize again that, to be actionable, the story must be materially false. If the author has merely hyperbolized, provided colorful rhetorical description of appellant's anger, that will not suffice. RESTATEMENT (SECOND) OF TORTS § 581A cmt. f (1977) ("Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."); *see also Masson*, 501 U.S. at 516–17, 111 S.Ct. 2419 (applying "substantial truth" doctrine).

### C. False Light Invasion of Privacy

 We pause only briefly over appellant's related false light invasion of privacy claim. Though invasion of privacy false light is distinct from the tort of defamation, the same First Amendment protections apply. *See Moldea I*, 15 F.3d at 1151 ("[A] plaintiff may not avoid the stric-

tures of the burdens of proof associated with defamation by resorting to a claim of false light invasion."). Because the two torts are so similar, "[a] plaintiff may only recover on one of the two theories based on a single publication, but is free to plead them in the alternative." *Id.*

To prevail on a false light claim under District of Columbia law, appellant must show that (a) the published material places appellant in a false light which "would be highly offensive to a reasonable person," and (b) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Id.* at 1150–51 (quoting RESTATEMENT (SECOND) OF TORTS § 652E). The second element tracks the First Amendment's intent requirement for defamation claims brought by public figures, *see New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, and the court at this stage assumes the requisite state of mind. The *Restatement Second of Torts* recognizes that the "highly offensive" and "odious, infamous, and ridiculous" inquiries, though similar, may sometimes produce different results. RESTATEMENT (SECOND) OF TORTS § 652E cmt. b. We remind the District Court that, before finding that a statement is not actionable, because it is not reasonably capable of defamatory meaning, it must also satisfy itself that the statement does not arguably place appellant in a "highly offensive" false light.

### III. Conclusion

Political commentary can be brutal, and the brutality of that commentary alone does not render protected speech unprotected. But neither does the label "political commentary" insulate the reporting of verifiable and arguably defamatory facts. There is no doubt that a reasonable person, reading the article's repeated tale of appellant's volatile temper and apparent emotional instability, could very well conclude that appellant is an emotionally unstable individual unfit for his trade or profession. One or more of the anecdotes arguably make appellant appear personally odious, infamous, or ridiculous. On remand, the District Court must take pains to distinguish those anecdotes that are both verifiably false and reasonably capable of defamatory meaning from those that are not.

In remanding this case, we do not in any way suggest the proper outcome on the merits. Appellant must still clear a number of difficult hurdles. He must show that the potentially defamatory statements are indeed materially false. Because appellant is a public figure and the offending statements speak to his capabilities and credibility as a political actor, he must also "demonstrate by clear and convincing evidence that [appellees] published the defamatory falsehood with 'actual malice,' that is, with 'knowledge that it was false or with reckless disregard of whether it was false or not.' " *Liberty Lobby,* 838 F.2d at 1292 (quoting *New York Times,* 376 U.S. at 280, 84 S.Ct. 710).

We are mindful that trial courts are understandably wary of allowing unnecessary discovery where First Amendment values might be threatened. As we have suggested on previous occasions, the District Court may in its discretion limit discovery to the threshold issue of falsity, thereby delaying and possibly eliminating the more burdensome discovery surrounding evidence of "actual malice." *McBride v. Merrell Dow & Pharm., Inc.,* 800 F.2d 1208, 1214 (D.C.Cir.1986).

*So ordered.*