# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 18, 2020        Decided July 23, 2021

No. 20-7018

INNA KHODORKOVSKAYA,
APPELLANT

v.

JACQUELYN G. GAY AND KENNETH K. LIN,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-00809)

*Charles A. Foster* argued the cause for appellant. With him on the briefs was *Eric C. Rowe*.

*Barbara S. Wahl* argued the cause for appellee. With her on the brief was *Michael F. Dearington*.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:   Inna Khodorkovskaya brings this action against the director and the playwright of *Kleptocracy*, a play that ran for a month in 2019 at the Arena Stage in Washington, D.C.   Inna, who was a character in *Kleptocracy*, alleges that the play falsely depicted her as a prostitute and murderer.

The district court dismissed her complaint.   The court emphasized that *Kleptocracy* is a fictional play, even if inspired by historical events, and that the play employed various dramatic devices underscoring its fictional character.   In that context, the court held, no reasonable audience member would understand the play to communicate that the real-life Inna was a prostitute or murderer.   We agree with the district court and affirm its dismissal of her complaint.

## I.

Because the district court resolved the case on a motion to dismiss Inna's complaint, we draw our facts from her complaint.  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).   We can also consider the script of *Kleptocracy* and a video recording of the play:  the defendants attached the script and video to their motion to dismiss the complaint, and Inna supported consideration of the script and video in the district court and does so again in our court.

## A.

According to Inna's complaint, her husband, Mikhail Khodorkosvky, is a "businessman and philanthropist[] who was the head of the Russian oil company Yukos from 1996 until his arrest in 2003."  Compl. ¶ 12.  Mikhial is a longtime political opponent of Russian President Vladimir Putin.  *Id.* ¶ 13.  Putin's government persecuted Mikhail because Mikhail

"sought to promote democracy and fight corruption within the Russian Federation" and "became a strong critic of Putin's undemocratic policies." *Id.* ¶¶ 14–15.

Mikhail was tried and convicted of various offenses in Russia on two occasions, and the European Court of Human Rights has since found that aspects of the proceedings against him deprived him of basic human rights. *Id.* ¶¶ 16, 19–20. In 2013, Mikhail gained his release to Germany following negotiations between Germany and Russia. *Id.* ¶¶ 22–23.

In December 2015, Russia asked Interpol to issue a warrant for Mikhail's arrest for the 1998 murder of Vladimir Petukhov, a "Siberian mayor." *Id.* ¶¶ 24, 42. Previously, in 2005, two former Yukos employees—former executive Leonid Nevzlin and former security manager Alexey Pichugin—were charged with the shooting. *Id.* ¶ 26. Their trials, too, were condemned by the European Court of Human Rights. *Id.* ¶ 34. In 2015, the Russian government charged Mikhail with having ordered Petukhov's murder. *Id.* ¶ 42. "Interpol refused to issue the requested arrest warrant due to political motivations behind the charges against" Mikhail. *Id.* In 2016, Mikhail obtained political asylum in the U.K. and moved to London, *id.* ¶ 23, where his wife Inna Khodorkovskaya, the plaintiff in this case, currently resides, *id.* ¶ 9.

B.

In January 2019, the Arena Stage in Washington, D.C. ran the play *Kleptocracy* for approximately one month. *See id.* ¶ 49. *Kleptocracy* was written by Kenneth Lin and directed by Jacquelyn Gay. *Id.* ¶¶ 46–47. For purposes of this appeal, the parties accept the characterization of *Kleptocracy* as a "work of fiction" and a "fictional play inspired by historical events." Appellant's Br. 20, 34. The historical events that inspired the

"fictional play" are the political rise and fall of Mikhail Khodorkovsky in Russia. Vladimir Putin and Inna Khodorkovskaya are among the play's other characters.

*Kleptocracy* opens with a man, later identified as Putin, reciting a Russian absurdist poem. The audience is then introduced to a young Mikhail. He pursues Inna, who is initially reluctant but ultimately warms to him. Many years later, when Mikhail and Inna are married, Mikhail receives news that his oil company has been awarded a lucrative government contract. But Leonid Nevzlin informs him that Petukhov, a mayor in Russia, poses a problem to their oil operation. Nevzlin and Inna both seem to urge Mikhail to kill Petukhov, and the play seems to imply that he does.

Over the course of the play, Putin becomes a more central character, ultimately arresting Mikhail on false charges because Mikhail championed economic freedom in Russia. Many of Putin's monologues feature him interacting with a Siberian tiger, represented in the live show by a large stuffed animal. While in jail, Mikhail reads letters from Petukhov, and Petukhov—who, by this point in the play, has already been murdered—appears in Mikhail's cell as something of an apparition, reciting the text of the letters. Inna also visits Mikhail in jail and ultimately urges him to flee Russia with her. Mikhail refuses to flee until later, and he meets Putin one last time before leaving. At that meeting, Putin again recites parts of the Russian absurdist poem he introduced in the play's opening.

## C.

In March 2019, Inna Khodorkovskaya filed a complaint in the district court against Gay and Lin, asserting diversity jurisdiction under 28 U.S.C. § 1332. The complaint contains

5

two counts under District of Columbia law, one of false light invasion of privacy and one of intentional infliction of emotional distress. Both arise out of Inna's claim that *Kleptocracy* falsely portrayed her as a prostitute and murderer.

The defendants moved to dismiss the complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). Of particular salience, they contended that no reasonable audience member would have understood the challenged portrayals of Inna to be assertions of actual fact.

The district court granted the motion to dismiss the complaint. The court explained that "First Amendment protections apply to false-light and intentional infliction of emotional distress claims." Hearing Tr. 35:10–11, J.A. 418. One such protection is that, "[f]or liability to arise under the First Amendment, a representation must at minimum express or imply a verifiably false fact about an individual." *Id.* at 35:19–21. Here, the court held, even assuming "that *Kleptocracy* portrays the plaintiff as a prostitute and a murderer, these representations cannot reasonably be seen as communicating or implying actual facts." *Id.* at 38:11–13, J.A. 421. In reaching that conclusion, the court emphasized that "*Kleptocracy* is a theatrical play that, by custom and convention, signals to viewers that the events portrayed involve dramatizations rather than factual depictions of historical events." *Id.* at 37:13–16, J.A. 420.

## II.

The central question raised by this appeal is whether the play's alleged depictions of its character Inna as a prostitute or murderer would have been reasonably understood by the audience to communicate actual facts about the real-life Inna. The district court answered that question no, and we do as well.

We review the district court's dismissal of the complaint de novo, and we treat the complaint's factual allegations as true. *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1240 (D.C. Cir. 2018). A court can, at the motion-to-dismiss stage, conclude that challenged speech could not reasonably be understood to communicate actual facts about a person. *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623–24 (D.C. Cir. 2001); *cf. Trudeau v. FTC*, 456 F.3d 178, 193–94 (D.C. Cir. 2006); *Browning v. Clinton*, 292 F.3d 235, 247–48 (D.C. Cir. 2002). In conducting that analysis, a court can consider the allegations in the complaint together with any materials properly brought before the court as attachments. *See Trudeau*, 456 F.3d at 193. We thus consider the script and video recording of *Kleptocracy*, which, as noted, both parties urge us to examine.

A.

Inna's complaint asserts two causes of action under District of Columbia law, one for false light invasion of privacy and one for intentional infliction of emotional distress. In the context of those claims, the First Amendment protects—i.e., renders immune from suit—"statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (alteration in original) (quoting *Hustler Mag. v. Falwell*, 485 U.S. 46, 50 (1988)); *Weyrich*, 235 F.3d at 624. So if a challenged statement cannot reasonably be understood to communicate actual facts about the plaintiff, it is protected by the First Amendment and is non-actionable. That principle, which we will refer to as the *Milkovich* rule, "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which

has traditionally added much to the discourse of our Nation." *Weyrich*, 235 F.3d at 624 (quoting *Milkovich*, 497 U.S. at 20).

While the *Milkovich* rule came into being in defamation cases, the parties assume that it equally applies in actions for false light invasion of privacy and intentional infliction of emotional distress. In that connection, we have explained that, "[t]hough invasion of privacy false light is distinct from the tort of defamation, the same First Amendment protections apply." *Weyrich*, 235 F.3d at 627. And "a plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion." *Moldea v. N.Y. Times Co.* (*Moldea II*), 22 F.3d 310, 319 (D.C. Cir. 1994) (quoting *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1151 (D.C. Cir. 1994) (*Moldea I*)); *see also Hustler*, 485 U.S. 46 (applying actual-malice standard originally recognized in libel cases to claims of intentional infliction of emotional distress).

B.

Applying the *Milkovich* rule to the particular production at issue in this case, we conclude that *Kleptocracy*'s depictions of its character Inna could not reasonably be understood to communicate actual facts about the real-life Inna. As our decisions stress, "the First Amendment demands that we place [challenged works] in their proper context." *Weyrich*, 235 F.3d at 625. And the "'[c]ontext' includes not only the immediate context of the disputed statements, but also the type of publication" and "the genre of writing." *Farah v. Esquire Mag.*, 736 F.3d 528, 535 (D.C. Cir. 2013). Understanding the context "is critical because 'it is in part the *settings* of the speech in question that makes [its] . . . nature apparent, and which helps determine the way in which the intended audience will receive [it].'" *Id.* (omission in original) (quoting *Moldea II*, 22 F.3d at 314). "Some types of writing or speech by custom

or convention signal to readers or listeners that what is being read or heard is likely to be opinion" or fiction, "not fact." *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984). That is so here.

*Kleptocracy* is not journalism; it is theater. It is, in particular, a theatrical production for a live audience, a genre in which drama and dramatic license are generally the coin of the realm. That is why the defendants are a playwright and a theatrical director, not journalists or documentarians. In fact, Inna, as noted, affirmatively accepts "the fact that the play is a work of fiction." Appellant's Br. 20. To be sure, even if *Kleptocracy* is a fictional play, Inna assumes it is a "fictional play inspired by historical events." *Id.* at 34. But a fictional play, even if inspired by historical events, by definition is not— and does not purport to be—a historical documentary: a documentary by nature is a work of non-fiction.

None of this is necessarily to say that a theatrical production, or even a fictional play, is categorically incapable of communicating actual facts about a person, regardless of the circumstances of a particular production or of what may be said or imparted to the audience in a specific situation. The defendants here assume that "no categorical immunity from defamation exists for theatrical productions," Appellees' Br. 30, and we need not adopt any kind of blanket rule for purposes of deciding this case. But our decisions emphasize that the genre matters when assessing whether challenged speech is reasonably understood to communicate actual facts about a person. We have held, for instance, that the genre of a book review is one in which "[t]here is a long and rich history in our cultural and legal tradition of affording reviewers latitude to comment." *Moldea II*, 22 F.3d at 315. The "First Amendment," we said, "requires that the courts allow latitude." *Id.* The case for latitude is all the more evident when the genre

is art in the form of a fictional theatrical production, including one inspired by historical events.

History has long been a muse for art. Several of Shakespeare's plays—think *Richard III*, for instance—are prominent examples of historical fiction. But historical fiction, while inspired by history, is, at bottom, fiction. And a reasonable viewer of historical fiction understands that what she is watching is not an actual rendering of historical events as they in fact occurred. The Supreme Court thus has explained that "an acknowledgment that [a] work is so-called docudrama or historical fiction . . . might indicate that . . . quotations should not be interpreted as the actual statements of the speaker to whom they are attributed." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 512–13 (1991).

The Ninth Circuit, considering a made-for-television movie about a prominent murder case from the 1970s, observed that "[d]ocudramas, as their names suggest[], often rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience." *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995). The court "believe[d] that viewers in this case would be sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts. To the contrary, most of them are aware by now that parts of such programs are more fiction than fact." *Id.* And as of the present day, viewers are "generally familiar with dramatized, fact-based movies and miniseries in which scenes, conversations, and even characters are fictionalized and imagined." *De Havilland v. FX Networks, LLC*, 230 Cal. Rptr. 3d 625, 643 (Cal. Ct. App. 2018).

Several features of *Kleptocracy* fortify the sense that, within the somewhat fluid categories of historical fiction or

docudrama, a reasonable audience member would be particularly unlikely to conclude that the play's depictions are meant to communicate actual facts about a person. In certain respects, in fact, *Kleptocracy* verges on historical fantasy more than historical fiction.

First, the play depicts a Siberian tiger in a number of scenes as the companion of an often-comical Vladimir Putin. The tiger's circumstances seem to mimic Mikhail's throughout the play. When Mikhail is arrested, the next scene shows Putin sitting on the sleeping tiger (played by a larger-than-life-sized stuffed animal). On two occasions in which Mikhail is attacked in prison, the ensuing scenes feature Putin apparently butchering a tiger and then laying a tiger skin on his office floor, respectively. The fictional and metaphorical tiger reinforces to the reasonable audience member that the play's contents cannot be taken literally.

Second, and similarly, the play depicts the ghost of the Siberian mayor Petukhov as visible to Mikhail. Petukhov—whose murder Mikhail seems to have authorized, and who is deceased by this point in the play—appears in Mikhail's prison cell, drinks tea with him, and recites the letters that he wrote to Mikhail before his death. Mikhail responds to Petukhov in between the lines of Petukhov's letter, remarking that he "should have come to visit" Petukhov's region and "should have responded" to his criticisms. J.A. 261. Mikhail's vision of the deceased Petukhov, or the apparition of Petukhov, is a fantastical device used for dramatic effect. It confirms to any reasonable viewer that the play is fictional, even if inspired by historical events. No reasonable viewer could conclude that the scene intends to convey historical fact.

Third, at the beginning, middle, and end of *Kleptocracy*, Vladimir Putin's character recites a Russian absurdist poem

entitled *How a Man Crumbled*.  The poem concerns a man who proclaims his love for "voluptuous tarts," then grows immensely tall and "crumble[s] into a thousand tiny pieces." J.A. 170.  In the opening scene of the play, the audience does not yet know Putin's identity, and the actor recites the poem directly to them, evoking the chorus in a Greek tragedy.  In the middle of the play, Putin recites the poem to Mikhail before arresting him.  And at the end of the play, Putin repeats fragments of the poem into different telephones as he answers them and simultaneously blesses Mikhail's release from prison.  No reasonable audience member would infer that the real-life Vladimir Putin in fact recited the absurdist poem in any forum.  To the contrary, any reasonable audience member would appreciate the use of the poem as a dramatic, artistic device, underscoring the fictional, even fantastical—and decidedly non-documentary—nature of the play.

The specific scenes ostensibly depicting the character Inna as a prostitute and murderer must be considered against that backdrop.  Nothing in those scenes marks a break from the play's genre as a theatrical work of historical fiction or from the dramatic elements reinforcing that character.  Indeed, the scenes are fully in keeping with the attributes of the genre.

Inna posits that the depiction of her as a prostitute centers largely around the first scene in the play in which her character appears.  That scene immediately follows Putin's recitation of the absurdist poem at the outset of the production.  The scene contains a conversation between Inna and Mikhail at the start of their relationship.  Inna arrives with another man and goes up to her apartment with him, and when she returns to the street, she and Mikhail discuss his ambitions and why he wants Inna with him.  Inna claims that the scene, particularly in light of Putin's preceding recitation of a poem referring to "voluptuous tarts," depicts her as a prostitute, and we assume

it does for present purposes. Even so, the scene could not reasonably be understood to convey actual facts about the real-life Inna. The scene takes place directly in the wake of Putin's character reciting an absurdist poem to the live audience, and would be viewed by them in the immediate light of that pronounced example of dramatic license and fictional device.

Inna's contention that *Kleptocracy* depicts her as a murderer stems from another scene that takes place towards the beginning of the play. In that scene, Mikhail has been told by Nevzlin that the Siberian mayor Petukhov is speaking out against Mikhail and Yukos Oil. Nevzlin seems to suggest killing Petukhov before Inna re-enters the room. Inna "sees Petukhov," who appears onstage with the characters even though he could not in fact be present with the characters at the time. J.A. 191. Inna asks, "What are we going to do?" and agrees that they can show no weakness. She tells Mikhail, "You know what you're supposed to do." J.A. 192. When Mikhail says he needs to think, Inna "grabs him by the shirt, roughly," and "looks him in the eye." *Id.* She says, "Don't think! Want! Want! And the rest will follow." *Id.* Mikhail finally agrees. As Inna encourages everyone to open presents for Mikhail's birthday, two assassins "rush on to the stage and shoot Petukhov dead and drag his body away. Blood sprays on everyone, but only Mikhail sees it." *Id.* Inna kisses Mikhail to wish him a happy birthday, "blood and all." J.A. 193.

The scene is replete with fantastical elements: the murder victim, although plainly not in fact present, is killed in the same place (and at essentially the same time) that the decision to kill him is made, all during Mikhail's birthday celebration. One character in the scene somehow sees it happen even though it happens elsewhere, and although the rest appear not to, they end up with the victim's blood splattered on them. Also, Inna's lines evoke the familiar trope of a trusted confidante or partner

strong-arming a leader or protagonist into committing bad acts—e.g., Lady Macbeth convincing Macbeth to kill King Duncan. (Indeed, like Lady Macbeth, Inna later helps Mikhail figure out how to handle the fallout from committing murder.) Of course, a reasonable viewer need not recognize the parallels between Inna and Lady Macbeth. But the viewer can readily see Inna's influence over Mikhail in the scene as a dramatic device in a concededly fictional play, rather than as somehow an expression of actual fact about the real-life Inna amidst various self-evidently counterfactual elements.

In sum, in a play acknowledged to be a work of fiction and exhibiting a series of dramatic devices reinforcing its fictional character, the ostensible depictions of the on-stage Inna as a prostitute and murderer cannot reasonably be understood to communicate actual facts about the real-life Inna.

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*