Philip TACKA, Plaintiff,

v.

### GEORGETOWN UNIVERSITY, et al., Defendants.

### No. 99–0465–LFO.

United States District Court, District of Columbia.

Nov. 30, 2001.

---

44

Arthur Duncan McKey, Hanson & Molloy, Washington, DC, Joseph Armand Artabane, Artabane & Belden, P.C., Washington, DC, Philip Boris Zipin, Zipin & Melehy, LLC, Silver Spring, MD, for Plaintiff.

Kevin Taylor Baine, Williams & Connolly, Washington, DC, John Edward Scheuermann, Scheuerman & Terbune, Washington, DC, for Georgetown University, defendant.

Philip Frank Hudock, Reston, VA, John Edward Scheuermann, Scheuerman & Terbune, Washington, DC, for Elizabeth Prelinger, defendant.

### MEMORANDUM AND ORDER

OBERDORFER, District Judge.

The plaintiff in this case, Philip Tacka, a professor of music, is suing Georgetown University for defamation and breach of contract in connection with a failed application for tenure. Tacka's tenure application was voted upon and denied after an outside evaluator claimed that he had engaged in plagiarism. Georgetown ulti-

mately found the allegations of plagiarism to be unfounded, and granted Tacka tenure the following year.

The university seeks summary judgment on the breach of contract claim, arguing that it adhered to procedures in the Georgetown University Faculty Handbook, and Tacka suffered no compensable loss even if a breach did occur. Defendant argues that summary judgment should also be granted on the defamation claim because (1) plaintiff consented to the tenure committee's review of all outside evaluations, giving rise to an absolute privilege; and (2) Georgetown enjoys a qualified, common interest privilege to review those evaluations and relay them to other campus entities. For the reasons set forth below, defendant's motion for summary judgment is denied.

The following material facts are not in dispute. Tacka began teaching at Georgetown in 1980, shortly after completing his doctoral studies at Catholic University. He was selected for a tenure-track position in 1994 and first applied for tenure in late 1997. On February 29, 1998, while his tenure application was pending, Tacka was notified by a source outside the university that a charge of plagiarism had been made against him by Dr. Jill Trinka, a non-tenured professor at the University of North Texas. Trinka had been retained by Professor Elizabeth Prelinger, the chair of Department of Art, Music and Theater, on behalf of the departmental rank and tenure committee, to provide an external review of Tacka's scholarly work in connection with his tenure application. Trinka accused Tacka of plagiarism in her tenure evaluation, claiming substantial portions of an article he had published in *Studia Musicologica* had been plagiarized from a book written by Professor Michael Mark, then at Catholic University. Tacka had taken several classes from Dr. Mark there, and Mark had served as Tacka's

adviser. Tacka drew the purportedly plagiarized article from the introductory chapter of his own doctoral dissertation, which Mark had supervised.

Trinka's evaluation was sent to Prelinger in February 1998. On March 4, 1998, Tacka, alerted to the plagiarism charge, sent the first in a series of written communications to Prelinger, requesting that his application for tenure be delayed and the plagiarism charge be investigated in accordance with the procedures set forth in the faculty handbook. Despite these requests, the departmental rank and tenure committee twice considered and denied Tacka's application, and the university rank and tenure once considered and denied Tacka's tenure application—all without Tacka ever being given the chance to defend himself against the charge in person—before Prelinger referred the plagiarism charge to the Research Integrity Committee on July 22, 1998. That Committee issued a report on December 22, 1998 exonerating Tacka of plagiarism. The Committee, as well as a subsequently-convened Grievance Panel, both criticized the University for failure to adhere to its own procedures.

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* FED. R.CIV.P. 56(c). All reasonable inferences from the supporting records should be drawn in favor of the plaintiff, as the non-moving party, although plaintiff must evince the existence of a genuine issue of material fact. A material issue is one capable of affecting the substantive outcome of the litigation; a genuine issue is one supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## I. Count One: Breach of Contract

Plaintiff claims that Georgetown breached the contract created by the Faculty Handbook when it failed to adhere to the handbook's procedures, which require allegations of academic dishonesty to be referred to the Research Integrity Committee.

The University agrees that the faculty handbook creates an enforceable contract. *See McConnell v. Howard Univ.*, 818 F.2d 58, 62–63 (D.C.Cir.1987). However, according to defendant, there is no breach because neither the handbook nor common practice at Georgetown University require suspension of a tenure review process when an allegation of academic dishonesty, such as plagiarism, is received. But Tacka has also alleged that the University breached its contract with him when the Department addressed the plagiarism allegation internally in connection with his application for tenure before forwarding it to the Research Integrity Committee, an allegation premised on a specific provision of the faculty handbook.

While the handbook does not explicitly require the suspension of a tenure review process when an allegation of plagiarism is received, the handbook may be fairly read to require an allegation of plagiarism to be promptly submitted to the Research Integrity Committee. Adherence to the proper procedure likely would have resulted in suspension of the tenure review process, the second aspect of the breach alleged by plaintiff. *See* Memorandum from the Georgetown University Research Integrity Committee to Dorothy Brown, Vice President 9 (December 22, 1998) ("The Research Integrity Committee should have become involved at an earlier date and the application for tenure and promotion should have been put on hold throughout the duration of the investigation."). Instead, the departmental rank and tenure committee "agreed to pursue the matter, providing Professor Tacka with the opportunity to respond to the [accusation of plagiarism]." *See* Rank and Tenure Meeting for Professor Philip Tacka, Department of Art, Music & Theater 4 (June 1, 1998).

Appendix E, Section C of the faculty handbook, which calls for allegations of academic dishonesty to be referred to the Research Integrity Committee, is the exclusive, specific provision for resolving allegations of academic misconduct. Under general principles of contract law, a specific provision in a contract must be given due weight in the context of the contract as a whole. *See GLM P'ship v. Hartford Cas. Ins. Co.*, 753 A.2d 995, 999 (D.C.2000), *quoting Bolling Fed'l Credit Union v. Cumis Ins. Soc., Inc.*, 475 A.2d 382, 385 (D.C. 1984) (a "contract should be construed as a whole 'so as to give meaning to all of the express terms' ").

Defendant argues there is no breach because the complaint was "eventually" forwarded to the Research Integrity Committee after a delay from February 1998 to July 1998, and the handbook does not require an allegation to be submitted to the Committee within any particular period of time. A common sense reading of the faculty handbook precludes the notion that an unresolved charge of plagiarism would be allowed to linger indefinitely, particularly in light of handbook provisions requiring the Committee's prompt action. A member of the Committee who initially receives a complaint "shall immediately transmit the allegation to the Chairperson"; the Chairperson "shall promptly supply a copy" to the Executive Vice President; the respondent must be informed of the particulars of the complaint within ten days; a subcommittee must be convened within three days; and a recommendation must be issued within 30 days. Faculty Handbook at 93–94.

The University acknowledges that the Research Integrity Committee and Grievance Panel were critical of the failure to follow proper procedures, but argues these views should not affect the court's analysis. While the Committee's report and the Panel's decision are not controlling, their conclusions are germane and helpful in construing the faculty handbook in the absence of unambiguously clear provisions. Our Court of Appeals has instructed that: "It is undoubtedly correct that ambiguous contract terms 'must be construed in keeping with general usage and custom at the University and within the academic community.' Accordingly, we may look to the decisions of the Grievance Panel and Grievance Code Committee to gain an understanding of the issues before us ...." *Katz v. Georgetown Univ.*, 246 F.3d 685, 689 (D.C.Cir.2001).

Here, the faculty handbook is clear in requiring allegations of plagiarism to be addressed through the exclusive mechanism of the Research Integrity Committee. "This code applies to any person holding a University appointment or otherwise employed by the University who is alleged to have engaged in misconduct in research, including sponsored research. This code applies to all campuses and subdivisions of Georgetown University." Faculty Handbook at 93. The handbook is less clear—and is in fact silent—on the issue of whether a tenure review must be halted when an allegation of plagiarism is received. In these circumstances, the Research Integrity Committee's and Grievance Panel's interpretation are relevant, under *Katz*, to construe the terms of the contract created by the Faculty Handbook in accordance with the University's understanding, and create a question of material fact as to

Georgetown's custom and practice. *See Howard Univ. v. Best*, 547 A.2d 144, 150 (D.C.1988) (university custom and practice is extrinsic evidence necessary to interpret ambiguous portions of faculty handbook).

As a secondary argument, defendant contends that any breach was corrected when the Research Integrity Committee reviewed the plagiarism allegations and found them to be unsubstantiated, and when Tacka received a second review that resulted in his receipt of a tenured provision in 1999. Tacka invoked the faculty handbook on March 4, 1998 and repeatedly thereafter, but did not receive the review guaranteed by contract until his initial tenure application had been denied. This, noncompliance was cured after harm to Tacka had occurred.

█ As a variation of this argument, the University claims that even if a breach occurred, Tacka suffered no economic loss as a result. This assertion is based on Tacka's deposition testimony. According to the defendant, Tacka testified only that he fears his prospects for future promotion have been harmed, and asserts claims only for legal fees and medical bills, none of which are recoverable. *Id.* at 29.[1] This is contradicted by plaintiff's opposition to the motion for summary judgment, where he claims compensable economic loss including loss of seniority and one year's differential in the salary between a non-tenured assistant professor and a tenured associate professor, as well as recovery of legal fees incurred in connection with this dispute. Plaintiff has since provided a supplemental affidavit detailing the damages originally alleged in his complaint and restated in his opposition to the motion for summary judgment.

Loss of one year's pay at the higher salary earned by a tenured professor is a

---

**1.** The relevant text from the deposition is as follows: "Have I lost any income? I don't believe that I have lost income, but I have lost potential for increased income." Tacka Dep. at 519.

textbook example of damages. Tacka's deposition statement that he did not believe he had lost income may be used for impeachment purposes at trial, but the answer to a single question over the course of a two-day deposition does not justify granting summary judgment against him on his claim for breach of contract.

■ Plaintiff also retains additional bases for his damages claim, including loss of seniority and loss related to future promotion prospects. *Cf. Howard Univ. v. Baten*, 632 A.2d 389, 393 & n. 3 (D.C.1993) ("loss of earnings or earning capacity" is a "valid damage component[ ]" for university's breach of contract). Defendant is correct, however, in arguing that Tacka may not recover medical expenses or legal fees for breach of contract. *See Baten*, 632 A.2d at 392–393 (no recovery for medical expenses related to mental anguish); *McIntosh v. Aetna Life Ins. Co.*, 268 A.2d 518, 521 (D.C.1970) ("It is the rule in the District of Columbia that, absent a contract or statutory provision or a showing that the defendant's conduct was willfully and oppressively fraudulent, attorney's fees are not generally allowed as damages or costs.").

## II. Count Five: Defamation

Tacka claims that Prelinger, an authorized agent of the University, defamed him by publishing Trinka's accusation of plagiarism to the departmental rank and tenure committee and others in the University community. Tacka further claims that Prelinger failed to prevent Trinka from circulating information in his confidential tenure review to his professional peers.

■ In its motion for summary judgment, the University acknowledges that Prelinger's transmission of Trinka's evaluation is technically an act of publication.[2] However, defendant argues this publication is not actionable for two reasons: first, Tacka consented to the publication of required outside evaluations to the departmental rank and tenure committee by applying for tenure; and second, Prelinger enjoyed a qualified "common interest" privilege to transmit Trinka's evaluation to the departmental rank and tenure committee.

### 1. Law of the Case

■ Defendant has previously moved for summary judgment on the defamation claim. That motion, for partial summary judgment, was denied in an order issued July 17, 2001. Plaintiff argues that this order creates "law of the case" preventing reconsideration of the issues of privilege and consent. "The law of the case doctrine prevents relitigation of the same issue in the same case by courts of coordinate jurisdiction." *Johnson v. Capital City Mortgage Corp.*, 723 A.2d 852, 857 (D.C.1999) (internal citations omitted). The doctrine is not applicable here.[3] It can be debated whether an order denying

**2.** In its reply, the University argues for the first time that no publication occurred because the request for Trinka to serve as an evaluator was made by Prelinger on behalf of the department, and as such Prelinger's "intra-corporate transmittal" could not constitute publication. The court will not consider arguments raised for the first time in a reply brief. *See Kelso v. U.S. Dept. of State*, 13 F.Supp.2d 12, 17, n. 2 (D.D.C.1998). In any event, the District of Columbia does not recognize an absolute privilege, or principle of non-publication, for intra-corporate communications. *See Hanan v. Corso*, No. Civ. A. 95–0292TPJ–JMF, 1999 WL 320858 at *2 (D.D.C. May 18, 1999).

**3.** As a technical matter, law of the case doctrine applies only when an issue initially decided by one judge is presented again to a second judge. *See Johnson*, 723 A.2d at 857. A trial judge may always entertain a motion to reconsider a previous ruling.

summary judgment is final or interlocutory, but an order denying a motion for *partial* summary judgment is not final for purposes of creating law of the case.

■ Additionally, the University's current motion for summary judgment presents issues that are distinct from its earlier motion. Defendant's first motion for partial summary judgment focused on plaintiff's failure to establish the requisite elements of a defamation claim. The arguments of consent and privilege, the focus of the current motion, were raised only in a footnote in the reply brief.[4] Law of the case doctrine does not apply when issues asserted in a later motion are "largely different" from the grounds asserted in the first motion. *Sherman v. District of Columbia,* 653 A.2d 866, 869, n. 2 (D.C. 1995).

### 2. Consent to Publication

According to the University, its conduct is protected by an absolute privilege because Tacka consented to publication of Trinka's evaluation. In applying for tenure, Tacka agreed to the evaluation of articles he had published in academic journals and implicitly consented, under the terms of the faculty handbook, to the "publication" of those evaluations to the departmental rank and tenure committee. Under the *Farrington* line of cases,[5] the defendant argues this created a privilege that cannot be overcome by a showing of malice or excessive publication.

Under the test established in *Farrington,* an employer's evaluation of an employee is protected by an absolute privilege where "(1) there was either express or implied consent to the publication; (2) the statements were relevant to the purpose for which consent was given; and, (3) the publication of those statements was limited to those with a legitimate interest in their content." 596 A.2d at 59.

The plaintiff concedes that he consented to the review of his work by outside evaluators when he applied for tenure, but argues he never consented to an evaluation by Trinka. Tacka has alleged that Trinka is not only unqualified, but also harbors a personal and professional bias against him. Tacka further contends that his consent was to a tenure review process conducted in accordance with the faculty handbook, which he did not receive. And as a legal matter, Tacka argues that his consent conferred only a qualified privilege, relying on a more recent decision, *Wallace v. Skadden, Arps, Meagher & Flom,* 715 A.2d 873 (D.C.1998).

In *Wallace,* the D.C. Court of Appeals held that consent to publication of an employment-related evaluation is qualified and can be overcome by evidence of excessive publication or malice.[6] "[W]e do not

---

4. In its entirety, the argument on privilege and consent stated: "Georgetown and Professor Prelinger's Motion for Partial Summary Judgment did not address the affirmative defenses of privilege and consent, which clearly apply. At a minimum, the publication of the evaluator's statement to the committee would be privileged under the 'common interest' privilege. *See Moss v. Stockard,* 580 A.2d 1011, 1024 (D.C.1990). *See also Columbia First Bank v. Ferguson,* 665 A.2d 650, 655 (D.C.1995)." Def. Reply at 1, n. 1.

5. *Farrington v. Bureau of Nat'l Affairs, Inc.,* 596 A.2d 58 (D.C.1991) is the most recent of the three cases holding an absolute privilege

applies to an employer's evaluation of an employee. The other two cases, also cited by defendant, are *Kraft v. W. Alanson White Psychiatric Found.,* 498 A.2d 1145 (D.C.1985) and *Joftes v. Kaufman,* 324 F.Supp. 660 (D.D.C.1971).

6. Defendant cites to the District of Columbia's standardized jury instruction stating consent is an absolute defense to defamation. This instruction is drawn from the most recent edition, published in April 1998, which predates the *Wallace* opinion by several months. As such, this instruction is unpersuasive.

agree with the contention that an employer's statements regarding the privilege or conduct of an employee are *absolutely* privileged." 715 A.2d at 879. Although employers enjoy a long-recognized privilege from defamation in employee evaluations, "[t]he privilege in question . . . exists only in the absence of malice; it is a qualified privilege." *Id.* (internal citations, quotations omitted). A qualified privilege may be lost for reasons of excessive publication as well as malice. "[T]he basis, if any, for excusing dissemination of a defamatory report within a faculty . . . or within an employment group . . . is . . . the existence of a qualified privilege—a privilege which can be lost if the publication occurs outside normal channels, is otherwise excessive, or was made with malicious intent." *See District of Columbia v. Thompson,* 570 A.2d 277, 292 (D.C.1990), *vacated in part on other grounds,* 593 A.2d 621 (D.C.1991).

The University contends that *Wallace* distinguished but did not overrule the *Farrington* line of cases,[7] and that *Farrington* is controlling on the facts of Tacka's claim. Tacka, unlike the plaintiff in *Wallace,* was subject to a contract, the faculty handbook, that "contemplated the publication of the evaluations of which . . . plaintiff [i]s complaining." 715 A.2d at 880. Tacka also, according to defendant, affirmatively consented to Trinka's defamatory evaluation by seeking tenure. A qualified privilege existed in *Wallace* only due to the "absence of contract or of some affirmative act of consent," *id.* at 881; because Tacka provided consent either under the terms of the faculty handbook or by applying for tenure, the University should be protected by an absolute privilege.

Although this argument is superficially compelling, *Wallace* provides a alternative reading of the *Farrington* line of cases—borne out by the cases themselves—that the "absolute" privilege they establish is in fact more akin to a qualified privilege that cannot overcome genuine issues of material fact on issues of malice or excessive publication. The *Wallace* court rejects the argument that defendants can "escape liability even if . . . they falsely and maliciously represent[ ] to interested third parties, or each other," serious accusations about an employee. 715 A.2d at 879. The application of an absolute privilege in *Farrington* carried little sting because the alleged defamatory statements were trivial:

> The substance of the allegedly defamatory statements in *Farrington* was that plaintiff was careless and inaccurate and that his work was unsatisfactory. Although the court referred to the defendant's privilege as absolute, it is not obvious that the employer would or should have prevailed even if plaintiff's supervisors had falsely stated in their evaluations that the plaintiff had embezzled company funds of molested his secretary's five-year-old daughter. 715 A.2d at 880, n. 12.

For an academic, an accusation of plagiarism is far more serious than mere carelessness or inaccuracy, approaching the defamatory impact of a statement that an employee in the private sector has embezzled company funds. Similarly, the *Wallace* court read *Kraft v. W. Alanson White Psychiatric Found.,* in light of *Greenya v. George Washington Univ.,* 512 F.2d 556 (D.C.Cir.1975).

---

**7.** In a recent decision, the D.C. Court of Appeals declined to resolve whether *Farrington* or *Wallace* governed "the scope and consequence" of an employee's consent to release employment information, assuming *arguendo* that consent conferred only a qualified privilege. *See Woodfield v. Providence Hosp.,* 779 A.2d 933, 938 (D.C.2001). It is therefore unclear which precedent the D.C. Court of Appeals considers controlling.

*Kraft* may profitably be compared with *Greenya* .... In *Greenya,* ... the court held that faculty members of educational institutions 'enjoy a qualified privilege to discuss the qualifications and character of fellow officers and faculty members, if the matter communicated is pertinent to the functioning of the educational institution,' but that this qualified privilege may be overcome, *inter alia,* by proof 'that publication was made with malicious intent.' 715 A.2d at 880, n. 13, *quoting* 512 F.2d at 563.

Application of a qualified rather than absolute privilege is further borne out by *Joftes v. Kaufman,* the genesis of the *Farrington* line of cases. Despite holding that an "absolute" privilege protected the employer, the court nonetheless noted that "any evidence of malice is exceedingly slim." 324 F.Supp. at 662, n. 1. Additionally, summary judgment was granted on the basis of this "absolute" privilege only because the plaintiff was unable to establish excessive publication as a genuine issue of material fact. "The grounds for the privilege, of course, do not exist where the employer publishes the notice ... to persons without a legitimate job-related interest in receiving it." *Id.* at 664.

The application of a qualified rather than absolute privilege is warranted in light of the implicit, rather than explicit, nature of Tacka's consent. Georgetown would have a much stronger claim to absolute privilege if, for example, Tacka were suing over publication to Research Integrity Committee, which he specifically requested. *Compare* Restatement (Second) of Torts § 583, cmt. d(2) (1977), *quoted in Wallace,* 715 A.2d at 881, n. 14 ("A, a school teacher, is summarily discharged by the school board. He demands that the reason for his dismissal be made public. B, the president of the board, publishes the reason. A has consented to the publication even though it turns out to be defamatory."). Employers should not, however, be given an absolute license to publish statements about employees in the absence of such an affirmative act of consent.

■■■ *Wallace* not only distinguishes the *Farrington* line of cases on the basis of whether an employee has consented to the evaluation in contract or through an affirmative act of consent, but also questions whether the "absolute" privilege found in *Farrington* should apply at all in cases where the alleged defamation goes far beyond criticism of an employee's work performance and a substantial question exists as to malice or excessive publication. In this case, where a serious charge was made against the plaintiff, and where he has raised significant questions as to the defendant's motivation and the scope of publication, and where his consent, even though based in contract, is merely implicit, the University's privilege to publish defamatory statements is merely qualified, in accordance with *Wallace. See* 715 A.2d at 879.[8]

■■■ The defendant is not entitled to summary judgment on the basis of this qualified privilege. A qualified privilege is

---

8. Defendant could not prevail on this motion even under *Farrington.* In order to establish a plaintiff's consent for the purposes of creating an absolute privilege, a defendant has to show publication was "limited to those with a legitimate interest in the evaluation." 596 A.2d at 59. Prelinger's mismanagement of the plagiarism allegation has created a question of material fact on that issue, with plaintiff alleging that the charge should not have been shared with the department, or the members of the university administration. Under his theory of the case, the Research Integrity Committee has a legitimate interest in receiving and investigating *untested* allegations of plagiarism, but the tenure review committee only has a legitimate interest in receiving and considering *substantiated* complaints of academic misconduct.

lost through publication that is outside normal channels, or otherwise excessive, or that is made with malicious intent. *See* 715 A.2d at 880, *quoting Thompson* at 292. Plaintiff has alleged issues of material fact on both of these grounds. Tacka has argued that publication was not through the "normal channels" dictated by the faculty handbook, and as a result was excessive.[9] Tacka has also alleged that Prelinger's failure to adhere to the guidelines, and her overall mishandling of the plagiarism charge, was motivated by malice. Although defendant claims that Prelinger was obligated to share all evaluations received with the tenure review committee, the University's exclusion of the Trinka evaluation and the article underlying the plagiarism controversy from Tacka's subsequent, successful application for tenure gives rise to an inference that the evaluation was not so inextricably tied to his tenure application that Prelinger had no option but to forward it to the departmental rank and tenure committee.

### 3. Qualified Common Interest Privilege

The University argues that its faculty members had a qualified, "common interest" privilege to circulate the evaluation. "It is well accepted that officers and faculty members of educational organizations enjoy a qualified privilege to discuss the qualifications and character of fellow officers and faculty members, if the matter communicated is pertinent to the functioning of the educational institution." *Greenya*, 512 F.2d at 563 (D.C.Cir.1975). The defendant claims the publication of Trinka's evaluation is entitled to this qualified privilege, because the purpose of the evaluation, "to enable the University to make

an informed decision about promotion and tenure," Mot. at 13, is pertinent to the functioning of the educational institution, as required by *Greenya*. Plaintiff argues that genuine issues of material fact relating to malice and excessive publication prevent defendant from prevailing on the basis of this qualified privilege on a motion for summary judgment.

■ On the issue of excessive publication, the defendant argues the evaluation was forwarded only to those individuals who shared a common interest in evaluating Tacka's application for tenure. Plaintiff claims excessive publication occurs because Prelinger forwarded the allegation to the department and tenure committee rather than the Research Integrity Committee and because Prelinger failed to instruct Trinka to maintain the confidentiality of her evaluation. The first issue, which has already been discussed in greater detail, creates a factual question as to whether publication was so excessive as to waive the qualified privilege. On the second issue, Prelinger's deposition testimony creates a question of material fact—on being informed by Trinka of the plagiarism allegation, Prelinger's only response was "oh." Her impression was that Trinka was seeking her permission to share the allegation with members of the professional society to which she and Tacka both belonged, and while Prelinger did not provide that permission, neither did she remind Trinka that the evaluation was confidential. Defamation applies to re-publication, and plaintiff alleges that Trinka, in the absence of a reminder regarding the confidentiality of the tenure process, "broadcast the allegation" throughout the musicology community. Opp. at 16.

---

9. Because Tacka's allegations of excessive publication and malice are predicated in large part on his breach of contract claim, that the allegation of plagiarism should have gone directly to the Research Integrity Committee

before being considered by Tacka's departmental rank and tenure committee, it will be impossible for Tacka to prove defamation if he is unable to establish the University breached the terms of the faculty handbook.

 A genuine issue of material fact also exists on the question of malice.[10] Plaintiff has proffered multiple indicators of malice by Prelinger, which create a question of fact as to whether her primary motivation was to facilitate the review of Tacka's application for tenure or deliberately derail it. These allegations include procedural violations, involving failure to investigate the plagiarism charge, failure to involve extra-departmental faculty, and failure to provide the text serving as the basis of the charge, which plaintiff characterizes as having occurred in bad faith. Further instances of malice alleged by the plaintiff include Prelinger's failure to investigate Tacka's "intent" by asking him to explain the charge; failure to prevent re-publication by Trinka; her retention of Trinka to evaluate Tacka's tenure application despite constructive knowledge of Trinka's hostility towards him; her failure to require Trinka to disclose prior personal and professional contacts with Tacka; and her retention of Trinka despite knowledge that she was unqualified.

 While some of these allegations are stronger than others, on the record before the court it would be inappropriate to reach a conclusion on Prelinger's motivation. "The presence or absence of malice is a question of fact for the jury, but the plaintiff has the burden of proof." *Alade v. Borg-Warner Protective Servs. Corp.*, 28 F.Supp.2d 655, 657 (D.D.C.1998); *see also Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C.1983) ("while the existence of the privilege is a question of law for the court,

whether it was abused by the Defendant is a question of fact for the jury.").

For the foregoing reasons, it is this 30th day of November, 2001,

ORDERED that Defendant's Motion for Summary Judgment [dkt. # 69] is DENIED.

10. This question, however, is an exceedingly close one. Plaintiff will need to demonstrate at trial that the substantial majority of the actions Prelinger is alleged to have taken were in fact motivated by malice. If plaintiff is unable to establish evidence of malice that would persuade a reasonable trier of fact, a directed verdict will be entered in defendant's favor. If "the circumstances attending ...

publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant." *Millstein v. Henske*, 722 A.2d 850, 857 (D.C.1999), *quoting Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 291 (D.C.1977) (internal citation omitted).