Virgil H. MARSH, Plaintiff,

v.

Barry I. HOLLANDER, Defendant.

No. CIV.A.03–02412 CKK.

United States District Court,
District of Columbia.

July 9, 2004.

Virgil H. Marsh, Washington, DC, Pro se.

David Block Bergman, Arnold & Porter, Washington, DC, for Defendant.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

Currently pending before the Court is Defendant's Motion to Dismiss, which Plaintiff opposes. After reviewing the Defendant's Motion, Plaintiff's Opposition, Defendant's Reply, the submitted exhibits and the relevant law, the Court shall grant Defendant's Motion to Dismiss.

## I: BACKGROUND

On September 22, 2003, Plaintiff filed the above-captioned action.[1] Barry I. Hollander was named as Defendant. Compl. at 1. Plaintiff's Complaint contains two counts of libel, alleging that Defendant published or caused to be published false statements that were defamatory to Plaintiff's professional reputation as an attorney. *Id.* at 12–13.

The following facts are alleged in Plaintiff's Complaint. Plaintiff, Virgil H. Marsh, is a partner in the law firm partnership of Fisher Christen & Sabol. *Id.*

¶ 2. Defendant Hollander used to be a partner in that firm, but withdrew in July 1999. *Id.* ¶ 12. After Defendant left the firm, Plaintiff and Defendant proceeded to account for partnership funds and accounts receivable, pursuant to a 1986 partnership agreement and a 1999 supplementary agreement. *Id.* ¶¶ 14–18. On September 20, 1999, the bookkeeper at Fisher Christian & Sabol—Plaintiff's firm—made an entry of $11,479.78 as having been received from Maejima & Company. *Id.* ¶ 17. It was later determined that the bookkeeper had made an entry error and that Maejima & Company's account showed $8,405.60 paid "above the accounts receivable." *Id.* Since this client, Maejima & Company, had ceased using the services of Fisher Christen & Sabol and instead retained Defendant, Plaintiff notified Defendant and asked whether these funds had been sent to Plaintiff's firm mistakenly for work Defendant had done after he left the firm. Defendant responded that this was not the case. *Id.*

In 2002, more discussions took place between the two parties regarding accounts receivable. *Id.* ¶¶ 20–21. Plaintiff and Defendant had a meeting on July 16, 2002, with their own certified public accountants in attendance to resolve outstanding issues. *Id.* ¶ 23. At this point, the parties have somewhat different recollections of the evolution of the accounting dispute. According to Plaintiff, he told Defendant that the $8,415.60 discrepancy had not been resolved.[2] *Id.* Plaintiff further states that he told Defendant that the client "could have made an overpayment, but that the company had not asked for any return of such amount so it was basically certain that Maejima & Company had not made an overpayment." *Id.* Defendant ap-

---

1. Plaintiff is an attorney, appearing *pro se.*

2. Plaintiff's Complaint does not detail why the original $8,405.60 discrepancy later became a $8,415.60 discrepancy.

pears to have focused on the statement that the client "could have made an overpayment," and in providing Plaintiff with some accounting information regarding the client, requested that Plaintiff inform him of how the discrepancy was resolved. Def.'s Stmt. of P. & A. in Supp. of Def. Barry Hollander's Mot. to Dismiss ("Def.'s Stmt.") at 4. On September 20, 2002, Defendant faxed two letters to Plaintiff's office, which arrived within three minutes of each other. Compl. ¶¶ 32–33. One letter said that Defendant had "hired a new attorney, Howard Cayne of Arnold & Porter." *Id.* ¶ 32. The body of the other letter stated in its entirety:

> Further to my facsimile letter of July 26, 2002 please immediately provide me with a copy of your correspondence returning the $8,415.60 overpayment which you received from Maejima & Co. I need this information for ascertaining compliance with the DC Rules of Professional Conduct.

*Id.* ¶ 33; Def.'s Ex. 3. Plaintiff states that this letter was read by "at least one person" in his office before he received it. Compl. ¶ 33.

Plaintiff asserts that on September 25, 2002, he contacted the client to get information about the $8,415.60 payment, and about a week later he received information from the client that did not indicate any overpayment. *Id.* ¶¶ 34–35. Plaintiff states that this was consistent with other information Plaintiff collected from the firm's bookkeeper, and concluded there was no overpayment.[3] *Id.* ¶ 36.

Nearly a year later, on August 29, 2003, Plaintiff sent Defendant a letter stating that Defendant's September 20, 2002, letter was libelous, had been read by at least

one unnamed person in Plaintiff's office, and demanded a retraction. Compl. ¶ 38.

On September 2, 2003, Mr. Cayne (Defendant's personal attorney) responded via a hand-delivered letter to Plaintiff. *Id.* ¶ 39. In recounting the events that led up to the allegation of defamation, Defendant's attorney wrote:

> Mr. Hollander has informed me that during your July 16, 2002, meeting with your separate accountants you said that the September 20, 1999 overpayment in the amount of $8,415.60 by Maejima & Co., compared to the July 31, 1999 Fisher Christen & Sabol account receivable balance of $0.00, was not returned to the client because he had not asked for return of any money.

Def.'s Ex. 4 at 1 ¶ 2. The letter also requested that Plaintiff respond to Defendant's September 20, 2002, request for Plaintiff to inform Defendant of how the matter was resolved, and specifically asked for "an explanation and copies of supporting documents" regarding the client's account. Def.'s Ex. 4 at 2 ¶ 2.

Plaintiff responded with letters to Defendant and his attorney dated September 11 and 12, 2003, charging that the September 2, 2003, letter—in that it alleged the existence of an overpayment—was defamatory, accusing Defendant of causing the publication of defamation, and demanding a retraction. Compl. ¶ 40. Plaintiff alleges that at least one person in Plaintiff's office read the letter before it was given to Plaintiff. Compl. ¶ 39.

Plaintiff filed suit in the District of Columbia Superior Court on September 22, 2003. His Complaint alleges that with regard to both statements, Defendant was at

---

3. Defendant notes that Plaintiff's Complaint provides no facts suggesting that Plaintiff ever informed Defendant of the resolution of this issue prior to the filing of this lawsuit. Def.'s Stmt. at 5. As noted *supra,* the entire issue of Maejima & Company's overpayment was discovered by Plaintiff's law firm. *See* Compl. ¶ 17.

least negligent in not ascertaining the truth of the statements at the time of publication, that at least one person in Plaintiff's office read the statements, that the statements are libel *per se* as they involve the professional reputation of Plaintiff as an attorney, and that Defendant has not retracted the libelous statements. Compl. at 12–13. He claims damages of $500,000 for each count of libel "in assumed and punitive damages." *Id.* Defendant removed the case to federal court based on diversity jurisdiction on November 20, 2003, and filed the pending Motion to Dismiss on December 15, 2003.

## II: LEGAL STANDARD

Defendant argues that Plaintiff's Complaint must be dismissed because Plaintiff has failed to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In reviewing a motion to dismiss under Rule 12(b)(6), a court will not grant the motion "unless is appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court will assume that the facts alleged by Plaintiff are true, and any ambiguities or doubts concerning the sufficiency of the claim must be resolved in favor of the Plaintiff. *See Doe v. United States*

*Dep't of Justice,* 753 F.2d 1092, 1102 (D.C.Cir.1985). In addition, any inferences that can be drawn from those facts will be done so in favor of Plaintiff, as the non-moving party. *See Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979). However, the Court need not accept the legal conclusions of the non-moving party. *See Taylor v. FDIC,* 132 F.3d 753, 762 (D.C.Cir.1997).[4]

## III: DISCUSSION

In order to make out a *prima facie* case of defamation under District of Columbia law, a plaintiff must allege facts showing:

(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement is actionable as a matter of law irrespective of special harm, or that its publication caused the plaintiff special harm.

*Crowley v. N. Am. Telecomm. Ass'n,* 691 A.2d 1169, 1172 n. 2 (D.C.1997) (quoting *Prins v. Int'l Tel. & Telegraph Corp.,* 757 F.Supp. 87, 90 (D.D.C.1991)); *see also* Restatement (Second) of Torts § 558 (1977).[5]

4. Even though the Court has considered the allegedly defamatory letters, submitted by Defendant as exhibits to his motion, the Court does not convert the motion to one for summary judgment.

When reviewing a motion under Fed. R.Civ.P. 12(b)(6), if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...." Fed.R.Civ.P. 12(b). However, where a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered

without converting the motion to one for summary judgment. *Greenberg v. The Life Insurance Company of Va.,* 177 F.3d 507, 514 (6th Cir.1999).
*Vanover v. Hantman,* 77 F.Supp.2d 91, 98 (D.D.C.1999), *aff'd* 38 Fed.Appx. 4, 2002 WL 1359630 (D.C.Cir.2002).

5. District of Columbia defamation law relies heavily on the Restatement (Second) of Torts. *Compare Crowley v. N. Am. Telecomm. Ass'n,* 691 A.2d 1169, 1172 n. 2 (D.C.1997) (quoting *Prins v. Int'l Tel. & Telegraph Corp.,* 757 F.Supp. 87, 90 (D.D.C.1991)) *with* Restatement (Second) of Torts § 558 (1977).

Defendant argues that Plaintiff's case should be dismissed under Rule 12(b)(6) under each of the following alternative theories: (a) "on their face, the September 20, 2002 and September 2, 2003 letters are not defamatory;" (b) "Marsh fails to identify the listener or reader to whom these letters were allegedly published;" (c) "Marsh has not sufficiently alleged that Hollander's fault in publishing the statements amounts to at least negligence;" (d) "the statements, even if defamatory—and they are not—are protected by an absolute or qualified privilege." Def.'s Stmt. at 6.

The Court examines Defendant's arguments with regard to each statement, beginning with the September 2, 2003, statement.

### A. The Statement of September 2, 2003

■ The September 2, 2003, statement at issue, as noted *supra*, is a statement in a letter written by Defendant's attorney to Plaintiff, which stated:

> Mr. Hollander has informed me that during your July 16, 2002, meeting with your separate accountants you said that the September 20, 1999 overpayment in the amount of $8,415.60 by Maejima & Co., compared to the July 31, 1999 Fisher Christen & Sabol account receivable balance of $0.00, was not returned to the client because he had not asked for return of any money.

Def.'s Ex. 4 at 1 ¶ 2; *see also* Compl. ¶ 23. The letter was written in response to an August 29, 2003, letter by Plaintiff alleging that Defendant had defamed him in the September 20, 2002, letter. *Id.;* Compl. ¶ 38.

■ The Court has serious doubts that this statement can be said to be defamatory, as the statement is practically identical to a statement Plaintiff attributes to himself in his Complaint. *Compare* Def.'s Ex. 4 at 1, *with* Compl. ¶ 23. While this fact strongly suggests that the statement complained of in the September 2, 2003, letter is not "false," the question of whether an allegedly defamatory statement is false or true is reserved for the jury. *See Moss v. Stockard,* 580 A.2d 1011, 1023 (D.C.1990); *Weyrich v. The New Republic Inc.,* 235 F.3d 617, 623 (D.C.Cir.2001). However, the Court finds that even if the September 2, 2003, statement was defamatory, the Court is still forced to dismiss Count II because the statement falls under the judicial proceedings privilege.

■ Statements made in the course of judicial proceedings are protected by absolute immunity from defamation suits. Under District of Columbia defamation law, statements made for the purpose of preparing for litigation, or to attempting to settle issues prior to commencing litigation are covered by this absolute privilege. *See, e.g., Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.,* 774 A.2d 332, 338 (D.C.2001) ("Along with the overwhelming majority of the States, the District of Columbia has long recognized an absolute privilege for statements made preliminary to, or in the course of, a judicial proceeding, so long as the statements bear some relation to the proceeding"); *Sturdivant v. Seaboard Serv. Sys., Ltd.;* 459 A.2d 1058, 1059 (D.C.1983); *Brown v. Collins,* 402 F.2d 209, 212 (D.C.Cir.1968); *Lewis v. Elliott,* 628 F.Supp. 512, 516 (D.D.C.1986).

■ The purpose of the absolute privilege accorded to participants of judicial proceedings is to ensure that they can communicate as freely as possible in efforts to resolve their disputes without being constrained by the threat of a defamation charge. *See, e.g., Brown,* 402 F.2d at 213 ("The doctrine of absolute immunity for statements in judicial proceedings reflects a judgment that the need for com-

pletely free speech for litigants is dominant, and that this freedom is not to be endangered by subjecting parties to the burden of defending their motives in subsequent slander litigation ..."); *Sturdivant*, 459 A.2d at 1060 (the privilege "enables participants to state and support their positions without instituting a fear of retaliation, *i.e.*, an action for damages"); Restatement (Second) of Torts § 587, cmt. a (the purpose of the privilege as it pertains to parties is "based on the public interest in according to all men the utmost freedom of access to the courts of justice for the settlement of their disputes").

It is appropriate for a court, in considering a 12(b)(6) motion, to decide any preliminary questions of absolute privilege such as the judicial proceedings privilege. "These 'absolute privileges' are based chiefly upon a recognition of the necessity that certain persons, because of their special position or status, should be as free as possible from fear that their actions in that position might have an adverse effect upon their own personal interests." Restatement (Second) of Torts, Ch. 25, Title B, at 243. "To accomplish this, it is necessary for them to be protected not only from civil liability but also from the danger of even an unsuccessful civil action." *Id.* Courts in this District have previously dismissed defamation claims at the motion to

dismiss stage when the facts alleged by the plaintiff showed that the communication was privileged. *See, e.g., Messina v. Fontana*, 260 F.Supp.2d 173, 181 (D.D.C. 2003); *Alexander v. Evans–Afflick*, 1993 U.S. Dist. Lexis 16425, *21–22 (D.D.C. 1993). The District of Columbia Court of Appeals has also signaled that trial courts should rule as early as possible on the existence of an absolute privilege. *See, e.g., Finkelstein* at 340–41 (considering interlocutory appeal of trial courts denial of motion to dismiss which included absolute privilege argument).[6]

In light of this precedent, the Court turns now to make a preliminary determination of whether the statement is protected as a matter of law by a privilege such that the case must be dismissed at this stage, assuming all of the facts alleged by Plaintiff to be true and resolving all ambiguities and doubts in Plaintiff's favor.

Plaintiff acknowledges that Defendant's attorney, the author of the September 2, 2003, statement, is protected by the judicial proceedings privilege "because it was preliminary to possible judicial proceedings." Pl.'s Stmt. of P. & A. in Supp. of Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Stmt.") at 13.[7] However, he contends that the privilege does not apply to Defendant because he was acting as a client, not an attorney, when he made the statement to

---

**6.** In deciding to hear the appeal, the court wrote:

> we have jurisdiction to hear the appeal ... from the denial of their motion to dismiss based on their claim of absolute privilege. The determining consideration is that the judicial proceedings privilege is more than a defense to liability. The privilege is intended to afford an attorney absolute immunity from actions in defamation for communications related to judicial proceedings. The essence of an immunity from suit is an entitlement not to stand trial or face the other burdens of litigation. The doctrine of absolute immunity for statements in judicial

> proceedings reflects a judgment that the need for completely free speech for litigants is dominant, and that this freedom is not to be endangered by subjecting parties to the burden of defending their motives in subsequent slander litigation, or to the risk that juries may misapprehend those motives.

*Finkelstein*, 774 A.2d at 340 (internal punctuation and citations omitted).

**7.** Both sides agree that the letter was sent in response to an August 29, 2003, letter from Plaintiff to Defendant alleging that the September 20, 2002, letter constituted defamation. Compl. ¶ 38; Def's Ex. 4 at 1.

his attorney and caused his attorney to publish the statement.[8] *Id.* Plaintiff's position is based on his reading of the law that the privilege extends only to attorneys and not to parties. *Id.* at 13–16.

█ This reading is erroneous. It is clear that the judicial proceedings privilege applies to the range of potential participants in a legal proceeding—including attorneys, parties, judicial officers, witnesses, and jurors. *Brown,* 402 F.2d at 212 nn. 3–4 ("A party to a private litigation . . . is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding . . . . A similar immunity exists for counsel, witnesses, judge and jurors."); Restatement (Second) of Torts §§ 585–589. Moreover, the privilege extends not only to parties in a pending proceeding, but also to parties to potential litigation that has not yet commenced if the communication is related to the proceeding. *Sturdivant,* 459 A.2d at 1059 ("It is well settled that a defamatory action may not be grounded 'on a party's statements preliminary to or in the course of a judicial proceeding so long as the defamatory material has some relation . . . to the proceeding.' ") (quoting *Brown,* 402 F.2d at 212).[9] Given this law, and the fact that Plaintiff concedes that the statement was made "preliminary to possible judicial proceedings," Pl.'s Stmt. at 13, the Court finds that it must dismiss Count II of Plaintiff's Complaint.

## B. The Statement of September 20, 2002

█ Defendant sent a letter by fax to Plaintiff with the following text on September 20, 2002:

> Further to my facsimile letter of July 26, 2002 please immediately provide me with a copy of your correspondence returning the $8,415.60 overpayment which you received from Maejima & Co. I need this information for ascertaining compliance with the DC Rules of Professional Conduct.

Compl. ¶ 33; Def.'s Ex. 3. Plaintiff's Complaint does not specify which part of this letter he considered libelous, but he does make a considerable effort to explain why he believes no overpayment existed. Compl. ¶¶ 35–36. He also argues that Defendant's use of the word "the" before the word "overpayment" is evidence that Plaintiff is being accused on being in possession of a client's overpayment. Pl.'s Stmt. at 6–7. Plaintiff's Statement emphasizes that it is the first sentence—regarding an overpayment—that is the defamatory statement. *Id.* at 6–8. "The defendant's false charge of there being a definite overpayment is defamatory per se, and tends to injure his reputation and profession. The not so subtle comments by the defendant regarding the D.C. Rules of Professional Conduct and hiring

---

8. Plaintiff assumes that Defendant is liable for the allegedly defamatory statement published by Mr. Cayne, but does not explain how Defendant "caused" the publication of the statement or how Defendant would be liable for the actions of Mr. Cayne. Compl. ¶ 44, Pl.'s Stmt. at 6–7. Defendant does not challenge Plaintiff on his assumption. The Court notes, without deciding the question of law or the issue of causation here, that the Restatement advises that "one is liable for the publication of defamation by a third person whom as his servant, agent or otherwise he directs or pro-

cures to publish defamatory matter." Restatement (Second) of Torts § 577, cmt. f.

9. The Court observes that the privilege as it extends to attorneys would be gutted if attorneys could not repeat and protect statements they had received from their clients. "Private and amicable resolution of disputes is to be encouraged, not discouraged, as would happen if every lawyer's letter could provoke a defamation suit." *Messina,* 260 F.Supp.2d at 179.

a new attorney are believed to be synergistic with the defendant's false, defamatory statement." *Id.* at 8. Plaintiff does not argue that the second sentence of the letter—regarding compliance with D.C. professional conduct rules—is defamatory. The only comment Plaintiff has regarding that sentence is that it is "synergistic" with the allegedly defamatory statement. *Id.* Plaintiff also notes that as of August 2003, he had not received any information indicating that Defendant "had taken the matter to the D.C. Bar Ethics Committee." Compl. ¶ 37. Therefore, this Court reads Plaintiff's allegations of defamation regarding the September 20, 2002, letter as limited to the sentence regarding an overpayment.[10] The Court finds that Plaintiff cannot base a defamation claim on the first sentence of the September 20, 2002, letter, because the statement is not defamatory. The Court also finds that the statement is protected by the consent privilege.

### The Statement is Not Defamatory

■ Defendant asserts that Plaintiff cannot satisfy the first element of the four-element defamation definition, arguing that the content of the letter is not capable of any defamatory meaning. Def.'s Stmt. at 7. Defendant contends that it does not meet the case law threshold for "capable of defamatory meaning" in that it is not of a type that would tend to injure Plaintiff in his profession, because it does not accuse Plaintiff of any wrongful act or imply professional incompetence. *Id.* (citing *How-*

*ard Univ. v. Best,* 484 A.2d 958, 988 (D.C. 1984)).

Instead, Defendant portrays the statements as a request for information on any overpayment Plaintiff may have previously possessed, and for the documentation showing Plaintiff returned the overpayment to the client. Def.'s Reply Mem. in Supp. of His Mot. to Dismiss ("Def.'s Reply") at 3. Therefore, Defendant concludes, the statements do not rise to level of making Plaintiff appear "odious, infamous or ridiculous" necessary for such statements to be construed as defamatory. Def.'s Stmt. at 7 (citing *Klayman v. Segal,* 783 A.2d 607, 613 (D.C.2001)).

Plaintiff disagrees, stating that Defendant's statements clearly and falsely assert that Plaintiff is in possession of a client's overpayment, and that this "false charge" "tends to injure [Plaintiff's] reputation and profession." Pl.'s Stmt. at 8.

■ The Court recognizes that whether Defendant's statement was "false and defamatory," requires two independent inquiries. The question of whether a statement is true or false generally is a question of fact for the jury, and therefore, the falsity of the statement is assumed in a Rule 12(b)(6) motion. *See Moss,* 580 A.2d at 1023; *Weyrich,* 235 F.3d at 623. However, the Court can determine that a statement cannot be defamatory if it cannot be reasonably capable of a defamatory meaning. *Weyrich,* 235 F.3d at 627. "The publication must be considered as a whole, in

---

10. Even if Plaintiff had argued that the second sentence was defamatory, his claim would have failed. Part of a *prima facie* defamation case is an allegation that "the defendant made a false and defamatory statement concerning the plaintiff." *See supra.* Courts have dismissed claims that fail to allege how a possibly defamatory statement is "of and concerning" the plaintiff. *See, e.g., Ruf v. American Broadcasting Co., Inc.,* Civ.

No. 97–1427, 1999 U.S. Dist. LEXIS 1092 *20–21 (D.D.C. Jan. 29, 1999). Defendant's statement that he needed to ascertain compliance with D.C. professional conduct rules does not refer to Plaintiff's compliance or conduct, and Plaintiff makes no allegation that it does. Defendant may well have been concerned with his own, or his firm's compliance with the D.C. Bar's ethics rules.

the sense in which it would be understood by the readers to whom it was addressed." *Howard Univ.*, 484 A.2d at 989. "It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C.Cir. 1990) (citing *Levy v. American Mutual Ins. Co.*, 196 A.2d 475, 476 (D.C.App 1964)). However, whether a reader in fact understood a statement as being defamatory is a question for the jury. *Klayman*, 783 A.2d at 613 n. 6 (quoting Restatement 2nd of Torts § 614).

Case law suggests that if a juror could reasonably impute a lack of professional integrity or competence from a statement made in a business context, it often can be construed as defamatory. In one case, the District of Columbia Court of Appeals reversed a trial court's "failure to state a claim" dismissal when the trial court had determined that a statement was not capable of defamatory meaning. *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 878 (D.C.1998). The appeals court instead decided that when a former employer of the plaintiff stated that she "was frequently out of the office during office hours," it *could* have defamatory meaning, noting that "although perhaps inconclusive on its face, [it] could reasonably be construed, in context, as a reflection on her professional performance." *Id.* at 878.

■ However, context is key to determining whether, as a matter of law, a statement is capable of bearing a defamatory meaning. *See, e.g., Howard Univ.*, 484 A.2d at 989; *Wallace*, 715 A.2d at 878; *Klayman*, 783 A.2d at 614–19. For example, the District of Columbia Court of Appeals looked at context in upholding a trial court's 12(b)(6) dismissal of a defamation claim, finding that a "detailed review of the whole article, and the challenged material, in context" demonstrated that even if one or two sentences were offensive to the plaintiff, the article was focused on something that could not be construed as defamatory. *Klayman*, at 617. In another case, that court found that a statement in a report prepared by outside consultants hired to assess problems at a university department contained statements that were not defamatory "on their face" when it stated that "[t]he present chairman is actively opposed to the present administration. This lack of cooperation has forced the college administration into leadership activities which more appropriately should have been handled by this department." *Howard Univ.* at 988–89. A court in this District, in considering a 12(b)(6) motion, found that when managers told the plaintiffs said they were "sorry to hear about the sexual misconduct allegations," such statements could *not* be defamatory as a matter of law because they could not be "reasonably understood in any defamatory sense." *Ruf v. American Broadcasting Co., Inc.*, Civ. No. 97–1427, 1999 U.S. Dist. LEXIS 1092 *20 (D.D.C. Jan. 29, 1999). In context, these were words of "sympathy," and the plaintiff could not base a defamation claim based simply on the words "sexual misconduct allegations." *Id.*

In the case at bar, the Defendant's sentence refers to a belief in an overpayment, but also refers to a belief that Plaintiff had returned the overpayment to the client already and that Plaintiff had documentation to that effect ("[P]lease immediately provide me with a copy of your correspondence returning the $8,415.60 overpayment . . ."). Overpayments and under-payments are common occurrences in commerce that do not, without more, suggest

wrong-doing.[11] Words that imply an overpayment has occurred are not defamatory on their face. The Court notes that this statement does not charge Plaintiff with *overbilling*, which would carry with it a potentially defamatory connotation. The same could be said of words implying that Plaintiff knowingly and improperly retained an overpayment, as the reader could infer something negative about that person's "reputation and profession." However, Defendant's statement does not contain any allegation that Plaintiff had improperly withheld client funds. In fact, the reference to "returning" the overpayment implies that Defendant believes Plaintiff took the proper action with respect to funds that did not belong to Plaintiff. This sentence, when examined as a whole and in context, is not capable of bearing a defamatory meaning, as a matter of law. Therefore, Plaintiff cannot base a claim of defamation on this sentence.

### Privilege of Consent

 In the alternative, the Court finds that Defendant's statement regarding an overpayment, even if defamatory, is protected by the absolute privilege of consent.

 Defendant argues that the consent privilege covers his September 20, 2002, statement. "Consent is an absolute defense to a claim of defamation." *Farrington v. Bureau of Nat'l Affairs*, 596 A.2d 58, 59 (D.C.1991). In the District of Columbia, "the defense of consent has been incorporated into a three part analysis. The publication of a defamatory statement is privileged if: (1) there was either express or implied consent to the publication; (2) the statements were relevant to the purpose for which consent was given; and, (3) the publication of those statements was limited to those with a legitimate interest in their content." *Id.*

 Defendant contends that his statement's publication was consented to, pointing to the 1999 agreement executed by Plaintiff and Defendant providing for Defendant's separation from the partnership, which includes a section on resolving accounting disagreements. Def.'s Ex. 2 ¶ 4; Def's Stmt. at 14; Compl. ¶¶ 18, 22. The agreement states, in part:

> [Defendant] Hollander will be provided a complete copy of the final accounting. Upon request the [Plaintiff's] Law Firm will provide Hollander and his accountant with access to the documentation used in the accounting and any additional documentation necessary to review the completeness and accuracy of the accounting.

Def.'s Ex. 2 ¶ 4. Defendant argues that through this agreement Plaintiff consented to publication of statements related to settling accounting disputes. Plaintiff contends that he never gave his consent to publication of the statement regarding an overpayment and that Defendant has not established implied consent. Pl.'s Stmt. at

---

11. The Court notes, for example, that the use of the word "overpayment" in the media often is in a neutral context that does not imply personal wrong-doing. *See, e.g.*, Brian Faler, *Postal Service Goofs on Checks in the Mail*, Wash. Post, June 17, 2004, at A27 ("a computer error caused it to send overpayments averaging about $4,000 ...."); Susan Kinzie, *St. Mary's Budget Priority: Schools; Performance Report Among Proposals*, Wash. Post., April 1, 2004, at T1 ("Commissions plan to give school officials all the money ... thanks in part to a past overpayment of health-insurance costs that frees up extra money."); Nancy Trejos, *Prince George's Schools, Teachers Settle on 2%; Contract Goes to Union for Ratification Vote*, Dec. 23, 2003, at B1 ("For months, county teachers have complained about ... a new payroll system that has caused hundreds of overpayments and underpayments since it was introduced in May.")

15.[12] Plaintiff does not contest the existence of the privilege on either of the other two possible grounds: a requirement of relevance to the purpose of the consent, and a requirement that publication limited to those with an interest.[13]

The consent privilege has been found to arise in employer-employee contexts, see, e.g., Wallace, 715 A.2d at 878, as well as educational contexts, see, e.g., Kraft v. The William Alanson White Psychiatric Found., 498 A.2d 1145, 1149 (D.C.1985). In these situations, a court may find that a plaintiff had implied his or her consent to the publication of allegedly defamatory statements when the plaintiff was participating in an agreement that by its terms could involve receiving negative feedback.

See, e.g., Kraft, 498 A.2d at 1149 ("A person who seeks an academic credential and who is on notice that satisfactory performance is a prerequisite to his receipt of that credential consents to frank evaluation by those charged with the responsibility to supervise him.")

While consent is traditionally an absolute privilege, courts applying District of Columbia defamation law have been more nuanced in their application of the privilege in some contexts. In Wallace, the court found that implied consent to publication of employee performance information could be a qualified—not absolute—privilege when the employee was at-will and had never signed any formal agreement pertaining to such publication.[14]

**12.** Plaintiff also disagreed that a consent privilege exists on the grounds that Defendant did not have reasonable grounds to believe that the statement was true. Pl.'s Stmt. at 15. Plaintiff appears to be making an argument that Defendant may have been motivated by malice, but since the consent privilege is generally held to be an absolute, as opposed to a qualified, privilege, arguments regarding malice are irrelevant. See infra, note 13. Plaintiff does not contest the legal concept that the consent privilege is an absolute privilege.

**13.** Even though not contested by Plaintiff, the Court notes that Defendant appears to have met the two other requirements for establishing the consent privilege. Def.'s Stmt. at 15. The Restatement has warned that "the extent of the privilege is determined by the terms of the consent." Restatement (Second) of Torts, § 583, cmt. d. "[A] consent may be limited to a publication to a particular person or at a particular time or for a particular purpose. If so, the publication is privileged only if made within those limitations." Id. District of Columbia defamation law applies the privilege of consent only when the publication of those statements is limited to those with a legitimate interest in their content. Farrington, 596 A.2d at 59. The 1999 agreement was executed "by and among" the Plaintiff and Defendant as individuals but also their respective firms (Fisher, Christen & Sabol, and Hollander Law Firm, respectively), which

means that the two firms would have a legitimate interest in matters pursuant to that agreement. Def.'s Ex. 2 at 1. Plaintiff concedes that the September 20, 2002, letter involved a dispute that was part of a series of disagreements that the parties were trying to resolve pursuant to the 1999 agreement. Compl. ¶¶ 22–33.

Plaintiff alleges that Defendant published the September 20, 2002, letter to "at least one person in plaintiff's office" who "logged" it in, and the record shows that this office was the Plaintiff's law office at Fisher, Christen & Sabol. Compl. ¶¶ 2, 23; Def.'s Ex. 2. Defendant argues that as the office employees are agents of Plaintiff and his firm, they would have a legitimate interest in matters dealing with the 1999 agreement. Def.'s Stmt. at 15. Plaintiff has not argued that the third person or persons from his firm who allegedly read the September 2, 2002, letter had no legitimate interest in Defendant's statement that he was trying to resolve an accounting dispute, and there is nothing in the record suggesting otherwise.

**14.** The court in Wallace was concerned that an absolute privilege would mean that employers could "escape liability" even if they maliciously published false performance information about an employee. Wallace, 715 A.2d at 879. Hence, it argued that employer-employee communications, made in the absence of a formal agreement, should be pro-

*Wallace,* 715 A.2d at 880. That court contrasted its case with situations where an employee is part of a collective bargaining agreement that provides for the publication of performance information, which carries with it a stronger inference of consent. *Id.* (citing *Farrington,* 596 A.2d 58); *see also Joftes v. Kaufman,* 324 F.Supp. 660, 663 (D.D.C.1971) (finding that "[b]y virtue of his membership in the Staff Association, [plaintiff] Joftes had consented to a written statement of cause in the event of his dismissal."). "In each instance, the contract in question provided for or contemplated the publication of the [statements] of which each plaintiff was complaining." *Wallace,* 715 A.2d at 880.[15]

The facts of this case demonstrate that this case does not fall within the *Wallace* paradigm, but rather represents a case where the consent privilege is absolute. Here it is clear that Plaintiff consented to the publication of communications relating to the 1999 agreement between the two parties that included provisions for resolving accounting disagreements. Def.'s Ex. 2 ¶ 4; Def's Stmt. at 14; Compl. ¶¶ 18, 22. Plaintiff concedes that the ongoing discussions in 2002 regarding accounting disputes were aimed at executing this part of the agreement. Compl. ¶¶ 18, 22–24. The agreement specifically contemplates accounting-related communications from Defendant to Plaintiff in that it promised to provide Defendant—upon Defendant's request—with documentation "necessary to review the completeness and accuracy of the accounting." Def.'s Ex. 2 ¶ 4. Given the case law governing implied consent and communications between parties to a

formal agreement, this Court finds that as a matter of law Plaintiff gave his consent to the publication of communications that were "relevant to the purpose for which consent was given." *Farrington,* 596 A.2d at 59. The Court therefore concludes that the first sentence of the September 20, 2002, letter is protected by the absolute privilege of consent.

## IV: CONCLUSION

After reviewing the parties' briefing, the submitted exhibits and the relevant law, the Court shall grant Defendant's Motion to Dismiss. The Court finds that the statement alleged to be defamatory in Count II is protected by the judicial proceedings privilege, and the statement alleged to be defamatory in Count I is not capable of a defamatory meaning and in the alternative is protected by the consent privilege. An Order accompanies this Memorandum Opinion.

---

tected by only a qualified privilege such that an employer's malice would defeat the privilege. *Id.* This approach was followed by a court in this District in a case featuring a professor who was allegedly defamed by an evaluation received when he applied for tenure. *See Tacka v. Georgetown Univ.,* 193 F.Supp.2d 43, 50–51 (D.D.C.2001). Howev-

er, there is no case law based on D.C. defamation law arguing, outside this type of employment-employer context, that consent should be a qualified rather than absolute privilege.

**15.** Again, Plaintiff does not contest that the consent privilege is absolute as applied to this case.